State v. Gartland.

' THE STATE v. OWEN J. GARTLAND, Appellant.

Division Two, June 5, 1924.

1. **PRELIMINARY HEARING:** Waiver: Manslaughter: Amended Information Charging Murder. The defendant waived a preliminary hearing upon a complaint filed with a justice of the peace charging that he "unlawfully, feloniously, wilfully, deliberately" shot off his revolver "and with culpable negligence killed" a little girl. In the circuit court an information, reciting the same facts, but in somewhat different language, and technically charging murder in the second degree, was filed. *Held*, that the original information, charging the very acts upon which he was tried, sufficiently apprised defendant of everything necessary to prepare his defense, and having waived a preliminary hearing he waived any mistake or defect in the preliminary complaint, and his plea in abatement and his demurrer to the information filed in the circuit court were properly overruled.

2. **JURORS:** Participation in Demonstrations of Ku Klux Klan. Police officers, pursuing an automobile into the country, shot a girl in another car. The Ku Klux Klan held an indignation meeting at a park, and the girl's funeral was attended by the Klan in a body. Two jurors, accepted in the panel on their *voir dire* examination, testified they were members of the Klan, and they were challenged on account of their participation in demonstrations of the Klan. Both testified that they did not participate in the proceedings at the park or join in the funeral procession; that they had not attended any meeting of the Klan where the case was discussed, and that they could try the case fairly and impartially and would be guided by the evidence and instructions and render an impartial verdict. There was no attempt to show that their obligations to the Klan order interfered with their duties as citizens, nor to show what the demonstrations were. *Held*, that the trial court did not err in qualifying them as jurors.

3. **INSTRUCTION:** On Murder: Convicted of Manslaughter. A defendant convicted of manslaughter cannot complain of error in an instruction on murder in the second degree.

4. **ARREST:** Misdemeanor: Right of Officer. Where a felony has been committed, a sheriff, constable or other peace officer has a right, without a warrant, to arrest a person upon information, or upon reasonable ground to believe such person has committed the crime. But he has no right, without a warrant, to arrest for a misdemeanor unless the offense is committed in his immediate presence and

view. An exception to this common-law rule may be authorized by statute, but the only exception in this State applies to police officers of cities of five hundred thousand inhabitants or more (Sec. 8953, R. S. 1919).

5. ———: ———: In Presence and View: Meaning. The words "in the presence and view" found in the rule denying to a peace officer authority, without a warrant, to arrest for a misdemeanor, unless the offense is committed in his "presence and view," mean that he must have actual knowledge that the offense is committed and witness its perpetration. He cannot arrest upon suspicion, or information, or reasonable grounds to suspect.

6. ———: ———: Pursuing Automobile Suspected of Carrying Liquor: Instruction. Police officers of St. Joseph (or of any other part of the State except in cities of five hundred thousand inhabitants) have no legal right, without a warrant, to pursue an automobile and arrest its occupants on the ground that they suspect such occupants have intoxicating liquor in the car; and where, upon their summons, such car refuses to stop and they pursue and shoot at the occupants, and in doing so kill a girl in another car by the roadside, they cannot complain, when put upon their trial for murder, that the court refused to give instructions framed on the theory that they had reasonable ground to believe that the occupants in the car had committed a misdemeanor and they were in the performance of their duty in attempting to arrest them upon suspicion.

7. CULPABLE NEGLIGENCE: Personal: Common Design: Instruction to Include Act of Another. To render a defendant guilty of negligent homicide the negligent act which caused the death must have been his personal act, and not the act of another. Therefore, an instruction telling the jury that if three police officers were pursuing an automobile on the public highway and shooting at it in such manner as to constitute "culpable negligence" on the part of two of them (the defendant and his co-indictee) and that "in pursuing said car and firing said shots they were acting under a common design and purpose," and by means of said shots "a ball from one of the revolvers struck and killed" a girl in a car on the roadside, "then you will find defendant guilty of manslaughter," was erroneous, since it authorized the jury to find defendant guilty although the death was caused by the negligent act of his co-indictee.

8. ———: Police Officer: Responsibility for Acts of Subordinates. A police officer in immediate command of a squad of officers, where the facts show his superior authority, is responsible for the unwarranted acts of his subordinates.

Headnote 1: Indictments and Informations, 31 C. J. secs. 140, 146.
Headnote 2: Juries, 35 C. J. sec. 358 (1926 Anno). Headnote 3:
Criminal Law, 17 C. J. sec. 3705. Homicide, 30 C. J. sec. 712. Head-
notes 4 to 6; Arrest, 4, 5 C. J. secs 30, 31 (1926 Anno), 46; 5, 5 C. J.
secs. 31, 45; 6, 5 C. J. sec. 31. Headnotes 7 and 8: Homicide, 29 C. J.
sec. 141.

Appeal from Buchanan Circuit Court.—*Hon. W. H. Utz,*
Judge.

REVERSED AND REMANDED.

*J. V. Gaddy, S. K. Owens* and *J. D. McNeely* for ap-
pellant.

(1)   The court erred in failing to sustain plaintiff's
plea in abatement and motion to quash the third amended
information for the reason the said information was not
in fact an amended information but was a substitute
for the original information which charged manslaughter.
Said amended information raised the degree of the crime
and put an additional burden on the defendant.   (2)
The court erred in failing to sustain the defendant's chal-
lenge to the jurors, Bruess and Tracy.   On their ex-
amination in chief they admitted they were members of
the Ku Klux Klan, which organization under their evi-
dence took active part in creating sentiment against the
police department, of which this defendant was a member,
and creating sentiment for this prosecution.   Mo. Con-
stitution, art. 2, sec. 22; R. S. 1919 sec. 4017; State v.
Brook, 92 Mo. 542; State v. Punsher, 133 Mo. 44; State
v. Foley, 144 Mo. 600; Rooker v. Dearing Ry. Co., 247
S. W. 1018.   (3)   The court erred in failing to instruct
on the defendant's theory of the case, and failed and re-
fused to instruct as requested by the defendant in his
instructions A, B, C, D, and E.   The court refused and
failed to give any instruction wherein the defendant
would be declared to have a right as an officer to pursue
a party suspected of violation of the law.   Appropriate
instructions should have been given defining the officer's
rights, because of the fact that he was an officer and by
Sec. 7875, R. S. 1919, he was an officer of the State, and
every act that the defendant did was not only a lawful
act but also an act required in the discharge of his offi-

cial duty. State v. Dierberger, 96 Mo. 666; State v. Rollins, 226 Mo. 524; State v. McNally, 87 Mo. 651; State v. Fuller, 96 Mo. 166; State v. Cushenberry, 157 Mo. 181; State v. Grant, 79 Mo. 134; State v. Duncan, 116 Mo. 312; State v. Montgomery, 230 Mo. 660.

*Jesse W. Barrett,* Attorney-General, and *Allen May,* Special Assistant Attorney-General, for respondent.

(1) There was no error in overruling the plea in abatement and motion to quash. He was accorded, and waived, preliminary examination upon the same facts upon which he was tried. State v. Flannery, 263 Mo. 579, 586; State v. Jack, 209 S. W. 890. (2) There was no error in overruling the defense challenge for cause to veniremen Bruess and Tracy. (a) Where a statutory ground of challenge is not involved, challenges for cause are within the sound discretion of the trial court, the exercise of which will not be held error except where arbitrary abuse of discretion clearly appears. State v. Poor, 286 Mo. 644, 657; State v. Rasco, 239 Mo. 535, 561; State v. Brooks, 92 Mo. 542, 575; State v. Craft, 253 S. W. (Mo.) 227. (b) There was no specific challenge as required by our practice, stating the grounds therefor, at least as to the juror Bruess. State v. Mace, 262 Mo. 143, 154. (c) Examination of the panel as to membership in the Ku Klux Klan under the facts developed in such examination was proper; but only for the purpose of obtaining information to be used in exercising the right of peremptory challenge and not for challenge for cause. Bethel v. State, 257 S. W. (Ark.) 743. (3) The court erred in giving Instruction 9 under which defendant was convicted. (a) Said instruction authorizes a conviction of defendant for culpable negligence in the discharge of firearms, even though the fatal shot came from the gun of another officer, if they were engaged in a common enterprise, which was error. To render a person guilty of homicide because of the performance of a negligent act causing death, the negligent act must have been his personal, individual act. 29 C. J. 1155; 13 R. C. L. 858; Note 61 L. R. A. 297; Wharton on Hom-

icide (3 Ed.) p. 722; Kerr on Homicide, p. 164; Reg. v. Bennett, 8 Cox C. C. 74; Rex v. Green, 7 C. & P. 156; Rex v. Allen, 7 C. & P. 153; Rex v. Mastin, 6 C. & P. 396; Reg. v. Gregory, 2 F. & F. 153; Reg. v. Gray, 4 F. & F., 1098; Reg. v. Birchall, 4 F. & F. 1087; Hilton's Case, 2 Lewin C. C. 214; People v. Scanlon, 132 App. Div. 528, 117 N. Y. S. 57; Anderson v. State, 27 Tex. App. 177, 11 A. S. R. 189, 3 L. R. A. 644.   (b)   There are no accessories before the fact in involuntary manslaughter, at least where committed *per infortunium* or *se defendendo.*   State v. Hermann, 117 Mo. 629.   (c)   An instruction which purports to cover the whole case, but ignores a defense, is error.   State v. Slusher, 256 S. W. 817; State v. Gabriel, 256 S. W. 765.   (4)   The court erred in refusing defendant's offered instructions "C" and "E," or in failing to give a proper instruction submitting to the jury the facts of defendant's official character and capacity to the jury for their guidance in arriving at their verdict, it being improper to leave him in the same attitude as a private citizen or participant in a brawl.   State v. McNally, 87 Mo. 644, 651; State v. Dierberger, 96 Mo. 666, 9 A. S. R. 380; People v. Kilvington, 104 Cal. 86.

WHITE, J.—The appellant, with one George H. Pauly, in the Circuit Court of Buchanan County, was charged with murder in the second degree, and on a severance was convicted of manslaughter, and his punishment assessed at two years' imprisonment in the penitentiary.

On October 19, 1922, Gartland, Pauly and one Stroud were members of the police force of St. Joseph, doing general patrol duty in a Ford automobile.   About 7:30 P. M. that day they met a Buick automobile with one headlight out.   One of the officers called to the occupants of the Buick car to pull in to the curb and fix the light. Instead of doing so the driver of the Buick drove on; the officers turned around and started in pursuit of it.   According to the testimony of Gartland they chased it for about forty blocks through the city, and then east of the

city on the Mitchell Avenue road to the Leonard road, where they turned south, crossing a bridge and some railroad tracks, until they reached the Pickett Road, where they turned east, all the time following the car by its tail light. In this pursuit shots were fired by officers Gartland and Pauly before and after they got on the Pickett Road. The car they were pursuing passed a Ford going up a hill on the Pickett Road, and was lost to sight by the pursuers who came up to where the Ford was stopped by the roadside, passed it, and then backed up to where it was. This Ford which they overtook had four occupants: William Hale, aged twenty-three years; Everett Hale, brother, seventeen, in the front seat, Everett driving. In the rear seat were Nellie Hale, sister, aged fourteen, and Joy Corlis, a boy fifteen years old.

As the police car backed up one of the officers said: "They were shooting at you," and Everett replied: "No sir, they didn't shoot: *you* shot my sister." Nellie Hale was shot, the bullet entering near the spine and passing through the body, cutting the arch of the aorta, a wound which produced her death.

The girl was lifted out of Hale's car and placed in the care of the policemen for the purpose of being hurried to the hospital. They were then about three miles from the city. Gartland swore that the policemen started to take her to Noyes Hospital, but that she died before they reached the city.

According to the testimony of the Hale boys and Corlis, the Buick car passed them before the police car approached; no shots were fired from it, and Nellie Hale was shot after it passed and while they were on the Pickett Road.

In the police car Stroud was driving. Gartland sat with him in the front seat, and Pauly sat in the back seat. Gartland testified that he fired twice—one shot before they got to the wooden bridge and the railroad crossing. Then he saw he could not attract the attention of the man driving the Buick car, and said: " 'I will wait a

State v. Gartland.

few moments;' and the car was still traveling, and I stuck the gun up again about near the corner of the car and fired it up over the top of the Ford car.'' After they turned into the Pickett Road, Pauly fired three shots.

Dr. Hansen, who examined the body of the dead girl, testified: ''After I had gone into the office I came back and said, 'Men, the father says the police shot this girl,' and Gartland answered, saying: 'We couldn't see the Hale car for the dust; I fired twice over the car in the air, and I fired shorts.' Pauly spoke up and said: 'I fired three times,' but Stroud said, 'I didn't fire at all.' ''

Hugh Raphael, who was called ''Chief,'' testified that when Gartland made his report Gartland and Pauly told him what happened: ''He said they had been chasing a bootlegging car out at the east end and that they had accidentally shot this girl.''

Some question is raised as to the authority of Gartland over the rest of the squad. He was not superior in rank, but was the oldest in service. Raphael, when asked if he knew who was in charge of the squad, replied: ''Why, I guess Gartland was in charge of the squad to a certain extent.''

Gartland himself testified on this subject: ''Three men are assigned to a car, and sometimes five, and whoever is the oldest one is in charge at the time, or maybe someone else, whoever the captain or officer down there feels like putting in charge going out. That is the rules down there.

''Q. Well, then, you were in charge at that time? A. Yes.''

Stroud testified that each one had the same authority, but Gartland being the oldest member on the force naturally they would listen to him; that Gartland gave the order to turn around and follow the Buick car. This question was asked:

''Q. Who was in charge of this squad of you three men? A. Well, there is always one man, you know, to bear the responsibility, and I suppose Gartland was in charge on account of his being the oldest member.

"Q. He was in charge and bearing the responsibility? A. I suppose so, if you want to put it that way."

Another policeman testified that Gartland gave orders to take the body to the police station.

The particular official duty of the officers at the time they are charged with shooting Nellie Hale is in question, and it becomes important to inquire the purpose of these officers in pursuing the Buick car. One headlight was out and they were entirely within their rights in ordering the occupants of the car to fix that light. They did not, however, pursue it for that reason. Likewise, they did not pursue it because it was exceeding the speed limit. The evidence does not show that any excessive speed was attained until they had pursued it for some distance. Gartland said that they reached thirty-five miles an hour. The driver of the Buick car testified that he attained forty-five miles an hour, but his speedometer was out of order. However, no speed limit was mentioned and no purpose was shown for pursuing the car on account of that.

When asked why the police tried to catch the Buick car, Gartland testified that there was an old tarpaulin on the back seat and it looked as if they had liquor covered up in that car. He further said, "The boys suggested that there was booze in that car and that was the reason he didn't stop, and I told the man to turn around and follow that car. That was the only order I gave."

He further said that: "When a police officer orders a man to stop and turn on his lights and he don't do it, he is suspected of having booze in his car, and we are supposed to follow him. It is our duty."

When asked why he thought it was a bootlegger's car, he said: "The man didn't act right."

The question was asked: "When did you come to the conclusion that it was a bootlegger's car? A. When he passed us and it looked suspicious that a man wouldn't stop and do what he was told to do."

Stroud testified that when they told the driver of the Buick car to turn on the light, the driver got away in

such a hurry "we thought there was something wrong and we thought he had something in his car, that he was trying to get away with something."

The Buick car was described as being a four-cylinder, having yellow wheels and with a Kansas license.

The driver of the Buick car was John Bond, twenty-one years old at the time of the trial, and with him was Miss Verna Nye, who, at the time of the trial, was Bond's wife. Bond quit work in the afternoon of October 19th, and went to the place where Miss Nye was employed at Eleventh and Mitchell Avenue in a tablet factory. He was then driving a Ford car. He took Miss Nye to his home, where they had supper with his father and mother. Either before or after supper he concluded the purchase of the Buick car, by trading for it. He then took Miss Nye, his father and mother, in the Buick and drove to the Olive Street Methodist church, where the father and mother of Bond got out and remained. He then drove on with Miss Nye until accosted by the police on account of one headlight being out. About seven-thirty in the evening the police car came up in front of them. As Bond drove by they called to him to pull up to the curb and fix his light. Instead of doing so Bond drove on and after he had gone about a half a block the police car turned and followed him. Then he evidently entered into the spirit of the chase. He was asked:

"Q. Why didn't you stop then when they called to you? A. Well, I am not in the habit of stopping when anybody hollers."

He further stated that he didn't want the car to catch up with him. He was asked why, and said: "Because I didn't. I don't let any car pass me up if I can help it." He testified he didn't know they were police officers who had called to him to stop and were chasing him. His wife—then Miss Verna Nye—testified to the same. The officers swore they were in full uniform. It was 7:30 in the evening, they came up from in front with the headlight on; there is nothing to indicate that street lights at that point illuminated the scene. Anyone

knows it is difficult to see the form of a person driving
a car from which the headlight shines. It is perfectly
reasonable that Bond could not see the officers' uniforms
or tell they were officers. Stroud testified that he could
not tell whether the occupants of the Buick car were two
men, two women, or a man and a woman. Gartland
showed his defective observation, because he said there
were two men in the Buick car. However, he said he
chased it so closely that it could not have stopped and no
one could have got out without being seen by him. Bond
and Miss Nye were in the Buick when it passed the Hale
Ford car; in fact, no question is raised but that Bond
and Miss Nye were in the Buick car all the time. They
kept in advance of the police car for several blocks in
the city, turned east on Mitchell Street road, then south
on the Leonard Road, crossed the bridge and the railroad
tracks, then east on the Pickett Road, where they over-
took the Hale car and passed it, went on about a mile or
more further out to a place called Saxton, where he bought
five gallons of gasoline, found his tail light and one of
the headlights were out and his fender loose. Pursuing
officers mentioned this loose fender which rattled so as
to guide them in their chase. Both Bond and his wife
testified to the facts relating to the trip. They knew
nothing about the killing of Nellie Hale at the time. They
returned home from Saxton, left the Buick car on ac-
count of its defective lights, and Bond took Miss Nye
home in his Ford. He said he had no liquor in his car,
and there was no evidence whatever to indicate a justi-
fication of the officers' suspicion.

Impeachment of Bond was attempted by introducing
a record in the case of State of Missouri v. Sherman Mann
and John Bond, showing charge of burglary and larceny
in 1916, order of continuance, and in February, 1921, or-
der of dismissal. It will be noticed that Bond was only
twenty-one at the time of the Gartland trial in 1923.

On this evidence the charge against Gartland was
murder in the second degree. The jury found him guilty
of manslaughter, under Section 3236, and under an in-

struction authorizing a verdict for manslaughter where death is caused by culpable negligence. Judgment was entered accordingly and Gartland appealed.

I.   Before the trial the defendant filed a plea in abatement to the last amended information, on the ground that said information charged murder in the second degree, on which charge the defendant had not been allowed a preliminary hearing.

Preliminary Hearing.

The defendant was charged before a justice of the peace with manslaughter. On this charge he waived a preliminary hearing. His complaint is that the amended information charged an offense on which he had not waived preliminary hearing. He also demurred to the amended information, because it substituted a new charge. The plea in abatement and the demurrer were overruled, and to such ruling the defendant assigns error.

The complaint filed before a justice of the peace charged all the facts stated in the information upon which trial was had—that the defendants Gartland and Pauly "unlawfully, feloniously, wilfully, deliberately, etc., shot off their revolvers and with culpable negligence killed Nellie Hale."

The information before the justice of the peace uses exactly the same language in describing the circumstances of the killing.

The information upon which the trial was had charged the facts in a little different language, making the charge technically murder in the second degree. The trial judge in overruling the motion and the demurrer stated that the necessary substantial allegations were in both the affidavit and the original information which would justify the information for murder. We think the trial judge was correct in the construction of the original affidavit and information. Gartland before a justice of the peace waived preliminary hearing. He was there charged in almost the same language with the commission of the very acts upon which he was tried. The charge sufficiently ap-

304 Mo. Sup.—7.

prised the defendant of everything necessary to prepare his defense. In waiving a preliminary hearing the defendant waived any mistake or defect in the preliminary complaint charging him with the crime. [State v. Flannery, 263 Mo. 579.]

The trial court correctly overruled the plea and the demurrer.

II.   The defendant, for cause, challenged two jurors selected in the panel, Harold Bruess and J. A. Tracy. Jurors. These jurors in the *voir dire* examination stated they were members of the Ku Klux Klan. It appeared that the Ku Klux Klan had held some sort of an indignation meeting at Smith Park in regard to the killing of Nellie Hale; also it appears that the funeral procession was attended by the Ku Klux Klan in a body. Both of these jurors testified that they were at the Smith Park meeting of the Ku Klux Klan, but did not participate in any of the proceedings, nor join in the funeral procession. Tracy swore that he could try the case fairly and impartially, and be guided by the evidence and instruction to render an impartial verdict; that he had read in the papers an account of the affair, but had formed no opinion; that he had not attended any meeting of the Ku Klux Klan where the case was discussed. Mr. Bruess qualified in practically the same way as Mr. Tracy.

It does not appear that these jurors were challenged on account of their membership in the Ku Klux Klan; there was no attempt to show their obligation to the order interfered with their duties as citizens. The attempt was to show disqualification on account of participation in demonstrations of the Ku Klux Klan. It is not shown what those demonstrations were; it was assumed that the judge of the court and the jurors knew all about it. There is no proof that either of the jurors participated in such demonstrations. No error appears in the ruling of the trial court in qualifying the jurors.

III.   The appellant complains of error in an instruction on murder in the second degree.   Inasmuch as he was convicted of manslaughter he is in no position to complain of instructions on higher grade of crime because he was not affected by them.   The jury disregarded such instructions in finding him guilty of a lesser offense.

*Error in Instruction for Murder.*

IV.   Error is assigned to the action of the court in refusing to give instructions "C" and "E" asked by him. These instructions were framed on the theory that the officers Gartland and Pauly had reasonable ground to believe that the persons in the car they were pursuing had committed a misdemeanor, and they were in the performance of a duty.   This argument makes it necessary to examine the position of the officers and their duties in the premises.

*Arrest upon Suspicion: Defense for Murder.*

It is assumed by the appellant, and apparently conceded by the State, that the officers were entirely within their rights in halting the Buick car and in pursuing it.   It will be noted from the evidence set out above that they didn't attempt to stop the car, nor to pursue it, because of the absence of one headlight, nor on account of excessive speed.   Both the officers swore that they started in pursuit of Bond's car because they suspected that he had liquor in it.   Their intention apparently was to stop his car, and to search it: a proceeding they had no right to pursue unless they had a right to arrest Bond and his companion.

The rule is that where a felony has been committed a sheriff, constable or other officer, has a right without a warrant to arrest a person upon information or reasonable ground to believe that the person to be arrested has perpetrated the crime.   Sometimes this is expressed as "reasonable ground to suspect."   Such officer has no right without a warrant to arrest for a *misdemeanor* unless the misdemeanor is committed in the immediate *presence* and view of the officer.   This is the rule wherever the common law prevails.   [Wehmeyer v. Mulvihill, 150 Mo.

App. 1. c. 206; State v. Grant, 76 Mo. 1. c. 244-245; State v. Boyd, 196 Mo. 1. c. 59; State v. Underwood, 75 Mo. 1. c. 237; State v. Peters, 242 S. W. 1. c. 896.] A peace officer, *by statute,* may be authorized to arrest without a warrant for a misdemeanor not committed in his presence. In cities in this State having five hundred thousand population such authority is given by Section 8953, Revised Statutes 1919. That section is held to authorize police officers, in cities of that class, to arrest without a warrant for misdemeanor the same as in case of a felony, on information and reasonable ground to believe. [Hanser v. Bieber, 271 Mo. 326.] The reason for this statute as applied to cities is stated in that opinion (1. c. 337) where this court, through WALKER, J., said: "Anyone at all familiar with civil conditions in cities as contradistinguished from the country, realizes that greater power should be given police officers to preserve the peace and arrest offenders in cities than is given to peace officers elsewhere."

Other sections of the statutes relating to marshals of villages and of cities of the third and fourth classes, Sections 8239, 8248, 8426 and 8575, do not authorize such an officer to arrest for a misdemeanor unless the offense is committed in his presence. [State v. Evans, 161 Mo. 1. c. 109.]

Under Section 7959, Revised Statutes 1919, in cities of the first class, of which St. Joseph is one, policemen are made conservators of the peace and are authorized to arrest any person, "who shall break the peace or *be found* violating any ordinance." Under Section 7875, Revised Statutes 1919, such officers are made officers of the State of Missouri. But those sections do not give officers the right to arrest for a misdemeanor unless such misdemeanor is committed in their presence.

These statutes show that it is the legislative policy of this State to modify the common-law rule in respect to arrest for misdemeanors *only* in cities of the largest size. In the country and in the smaller towns the officers are bound by the common-law rule.

The statute authorizing sheriffs and police officers to arrest for violation of the Prohibition Act is Section 6597. It authorizes sheriffs, marshals, etc., "to apprehend and arrest any person or persons *found violating any of the provisions of this article."* It may be implied that such arrests may be made without warrant, but the statute does not say so. But the officer must *find* the offense being committed. This does not enlarge the common law authority to arrest for a misdemeanor unless committed "in the presence and view" of the officer.

When is an offense committed in the presence of an officer? The officer cannot arrest upon suspicion, or information, or reasonable grounds to suspect, that a misdemeanor is being committed. The cases are numerous showing the limit of his authority to actual knowledge that the offense is committed. It is not committed in his presence unless he knows it is committed.

In State ex rel. Brennan v. Dierker, 101 Mo. App. 636, the defendant was arrested for violating the game law and carrying quail out of a county. GOODE, J., in writing the opinion said, at page 643: "Peace officers, in the absence of an empowering statute, have no authority to arrest an individual for a misdemeanor without process, *except on view; that is, when they witness the perpetration of the offence."* (Italics ours).

In the case of State v. Holcomb, 86 Mo. 371, l. c. 380-381, it was held that an officer without a warrant had no right to arrest a man for carrying a concealed weapon because he did not know that he had the weapon. The rule is general. [Hughes v. State, 58 S. E. 390; Roberson v. State, 43 Fla. 156; O'Malley v. Whitaker, 118 La. 906; Pickett v. State, 99 Ga. 12; White v. McQueen, 96 Mich. 249; People v. Hochstim, 73 N. Y. S. 626; McCullough v. Greenfield, 133 Mich. 463; Eldredge v. Mitchell, 214 Mass. 480.]

In re Kellam 55 Kan. 700, the court states the common-law rule that felonies are excepted from the rule on account of the gravity of such offense; public safety demands and requires the prompt apprehension of crim-

inals charged with heinous crimes, but the power of officers to make arrests without warrant cannot be extended to minor offenses.

In Connecticut, Delaware, Illinois, Indiana, Kansas, Maryland, Michigan, Mississippi, North Carolina, Pennsylvania, and other states, the rule is stated that an officer without a warrant cannot arrest one for a misdemeanor in carrying a concealed weapon, on suspicion or information that the person arrested has the weapon on his person.

There are a number of cases directly in point: Where an officer seized a man without advising him that he was under arrest, and in the scuffle a bottle of whiskey fell from the defendant's pocket, it was held not admissible in evidence. [People v. Margelis, 186 N. W. (Mich.) 488.] So of the search of a defendant's grip without a warrant. [People v. Foreman, 188 N. W. 375.] In Ash v. Commonwealth, 236 S. W. 1032, evidence obtained by search of the defendant's grip was held inadmissible because the search was unlawful. In case of search of a prisoner arrested without warrant, and discovery of a concealed weapon, the search was unlawful (Pitts v. State, 80 S. E. (Ga.) 510). Where a defendant was searched without being arrested and whiskey which was not open to the observation was found in his pocket, it was held that the search was illegal and the evidence thus discovered was incompetent. [Helton v. Commonwealth, 243 S. W. (Ky.) 918, citing several cases.]

In Hughes v. State, 238 S. W. (Tenn.) 588, a sheriff had information, and actually saw, the defendant engaged in the whiskey traffic, searched and found whiskey in his car; the Supreme Court of Tennessee held that it was not an unreasonable search, but in an exhaustive review of the cases in the United States Supreme Court, and other decisions relating to unreasonable search, used this language, l. c. 595:

"It follows, therefore, that it cannot be said that the plaintiff in error was in the commission of an offense in the presence of the officers, so as to justify the arrest,

*merely from the fact that, when the arrest was effected,
it was found that he was actually committing an offense:*
Neither is it sufficient to justify an arrest that the officer
had information justifying him in the belief that an
offense was being committed, for the facts constituting
the offense must have been within the knowledge of the
officer, and that knowledge must have been revealed in
the officer's presence.  To illustrate:  If a person has in
his possession a concealed weapon, if he exposes it in
the presence of an officer or uses it, and the officer sees
it, then the officer may lawfully arrest him without a
warrant.  A person may have a concealed weapon upon
his person, but if there is no evidence of that fact ap-
parent to an officer his arrest would be unwarranted."

In this case the offense which the officers suspected
Bond was committing was a misdemeanor; they had no
right to arrest him on suspicion because they believed
or had reason to believe he was in the possession of liq-
uor; therefore they had no right to follow him for that
purpose.  It turned out that Bond was entirely innocent
of any offense against the liquor law.  At least, that ap-
pears conceded by the defense.  Bond was a very young
man, barely of age, probably with a touch of recklessness.
In a sort of bravado he didn't want to stop, "when any-
body hollered," nor allow anybody to catch him on the
road.  It was one of those characteristics which cause so
much trouble to joy-riders, and is sufficient to account
for his flight.  The officers were entirely without the
peace when they drove along the highway firing their
revolvers.  The trial court was not in error in refusing
instructions embodying the alleged defense.  They had
no defense except the defense that they did not do it.

IV.  Appellant complains of Instruction 9, given
on behalf of the State, which authorized the jury if it
found that Gartland, Pauly and Stroud were pursuing
an automobile on the highway and shooting
at it in such manner as to constitute "culpable
negligence on the part of defendants Gartland
and Pauly, and that in pursuing said car and firing said

Negligent
Act.

shots they were acting under a common design and purpose, and by means of said shots and by the manner and direction in which said shots were fired, a ball from one of the revolvers struck and killed the deceased Nellie Hale, then you will find the defendant Gartland guilty of manslaughter," etc.

To render a person guilty of negligent homicide the negligent act which caused the death must have been the personal act of the party charged and not the act of another. [13 R. C. L. p. 859; Johnson v. State, 61 L. R. A. (note) 1. c. 297; Wharton on Homicide (3 Ed.) pp. 722-723; People v. Scanlon, 117 N. Y. Supp. 57.] There could be no common design to commit a negligent act. The defendants Pauly and Gartland were not charged with a common *design* to commit an unlawful act, thus causing the death. The charge is a negligent act.

The Supreme Court of this State in the case of State v. Hermann, 117 Mo. 629, reviewed the authorities on the subject quoted from an English case (1. c. 636) to the effect that there can be no accessory in a case of manslaughter by mischance, *per infortunium*. A case directly in point here is Rex v. Mastin, 6 C. & P. 396, where two persons were racing on horseback on a public highway and passed a vehicle; one of them passed in safety and the other collided with the vehicle, causing the death of the person in the vehicle. The court held that the rider who passed in safety could not be held for manslaughter simply because at the time engaged in a common enterprise with one whose negligence directly caused the death. Instruction 9 authorizes the jury to find Gartland guilty although the death was caused by the negligent act of Pauly, and therefore the instruction was erroneous. Under the charge, as submitted, Gartland could be guilty only of causing the death of Nellie Hale if the negligence was his own personal act.

V.   Other errors are assigned, but we do not deem them of sufficient importance to merit discussion.   From the statement of the evidence set out above we think it possible to show, on re-trial of the case, that Gartland was in command of the police squad, and therefore responsible for the acts of his subordinates.   Likewise there is evidence of admissions of Gartland, and there may be evidence from which the jury might possibly find that his shot caused the death.

*Responsibility of Defendant.*

For these reasons the judgment is reversed and the cause remanded.   All concur.