**STATE of Missouri, Plaintiff–Respondent,**

**v.**

**Robert Emil SHROUT, Defendant–Appellant.**

**No. SD 32333.**

Missouri Court of Appeals, Southern District, Division Two.

Dec. 18, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 9, 2014.

Application for Transfer Denied Feb. 25, 2014.

---

See also, 2013 WL 5743808.

Timothy R. Cisar and Grant W. Smith, The Cisar Law, Firm, P.C, Lake Ozark, Missouri, Attorneys for Appellant.

Chris Koster, Attorney General, and Jennifer A. Rodewald, Assistant Attorney General, Jefferson City, Missouri, Attorneys for Respondent.

GARY W. LYNCH, J.

Robert Emil Shrout ("Defendant") appeals his conviction for involuntary manslaughter in the second degree, *see* section 565.024.3.[1] He raises four issues on appeal: (1) that he was not subject to a duty of care to the victim; (2) that, even if he was subject to such a duty, the evidence was insufficient to show that he breached that duty; (3) that section 565.024 is void for vagueness because it does not define "criminal negligence"; and (4) that both he and his wife cannot be found guilty of the second-degree involuntary manslaughter of the same person. Finding no merit in any of Defendant's claims, we affirm.

### Factual and Procedural Background [2]

Viewed in the light most favorable to the judgment, *see State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005), the following evidence was adduced at trial.

Aaron Johnson ("Victim") was the son of Defendant's wife, Ronda Shrout.[3] Victim had a twin brother. Following the separation of their natural parents, both boys went to live with their father. In 1994, both boys were removed from their father's home and taken into protective custody. George Stafford was guardian ad litem for both Victim and his brother throughout the time they were under the jurisdiction of the juvenile division of the circuit court. Initially, the boys were placed in various foster homes but were eventually serially moved to a number of group homes. Victim and his twin brother were considered mentally retarded and had behavioral issues; it was their behavioral issues that initially prompted the juvenile division to assume jurisdiction.

Victim and his brother were awarded approximately $100,000 as a result of a settlement in a lawsuit concerning abuse at a group home.[4] Victim's share of the settle-

---

1. All references to section 565.024 are to RSMo Cum.Supp.2005.

2. Twenty-five exhibits were admitted into evidence at trial. Defendant chose not to file or deposit them with this Court as allowed by Rule 30.05 and Rule 4 of the Southern District Special Rules. When an exhibit is omitted from the record on appeal and is not deposited with the appellate court, "its intendment and content will be taken as favorable to the trial court's ruling and as unfavorable to the appellant." *State v. Hawkins*, 328 S.W.3d 799, 810 n. 3 (Mo.App.2010) (quoting *State v. Davis*, 242 S.W.3d 446, 449 n. 1 (Mo.App.2007)).

3. Because she shares the same last name with Defendant, we will refer to Defendant's wife by her first name in the rest of this opinion. No familiarity or disrespect is intended.

4. A newspaper article incorrectly reported that the settlement amounted to $423,000. Thereafter, according to Stafford, "that half

ment funds was set up in an annuity to be paid out to him on a monthly basis beginning at age twenty-one, with guaranteed payments for thirty years, and payable to his estate upon his death. Following that award and noting that "[t]he State awarded my sons close to 500,000 apiece for their abuse[,]" Ronda requested that she and Defendant be awarded custody of both boys and be granted access to the money in order to "pay off [their] home and then add two more rooms."

Just before Defendant and Ronda sought custody of Victim and his brother, Stafford had decided to recommend that Ronda's parental rights be terminated, as the boys were nearing eighteen years old and neither Ronda nor Defendant had previously taken any interest in the boys. Stafford was suspicious of the Shrouts' sudden interest in Victim and his brother, as well as their interest in the settlement money. His concerns were somewhat alleviated when Ronda and Defendant continued to come to scheduled court hearings; however, he remained "leery" of the home circumstances. During meetings with Defendant and his wife, Stafford discussed at length the boys' special needs and the fact that resources would continue to be available to assist the Shrouts with the boys' care even after they turned eighteen.

Once in the care of Defendant and his wife, a transition which apparently occurred sometime in 2004, Victim had trouble maintaining a healthy weight. On August 26, 2004, Victim weighed 112 pounds. When admitted to Lakeland Regional Hospital on November 17, 2004, Victim weighed 98 pounds. During that hospital stay, it was noted that Victim was 24 pounds underweight and malnourished, and Victim's access to food was questioned. Victim remained in the hospital for eight days and, upon discharge, he weighed 109 pounds. Approximately seven months later, around July 2005, Victim was readmitted to the hospital and weighed 95 pounds. Again, Victim was found to be malnourished.

When he first moved in with Defendant and Ronda, Victim was utilizing the behavioral services of Pathways Community Behavior Healthcare. When Victim's case manager left that organization in December 2004, rather than see a new case manager, Defendant and Ronda requested that Victim's involvement at Pathways be stopped and his case closed.

According to Defendant's brother, Donald Shrout, Jr., when Victim and his twin brother first moved in with Defendant and his wife, "they seemed like pretty nice kids[,]" and they had no noticeable injuries or illnesses. However, during a visit in early 2005—approximately one year before Victim's death—Donald noticed that Victim appeared "real sickly"; Victim "was in his room in the corner and just in his briefs, underwear, and he was curled up in a corner[.]" The room was colder than the rest of the house. Victim "didn't have much weight on him[.]" When Donald asked Victim what he was doing, Victim replied, "I'm in trouble." Donald noticed a five-gallon bucket in the room, which Victim used as a toilet, and "just ... didn't like ... the way I saw him and the way they was treating him." Approximately one month before that visit, Donald saw Victim duct-taped to a chair in the kitchen. Victim was not allowed out of his bedroom when Donald was at the trailer. Donald "knew [Victim] was being abused" by Defendant and Ronda. Donald told Defendant and Ronda that "[t]his has gone too far" and that he "was going to go call the authorities and do something about it." Defendant and Ronda told Donald "to

million dollar figure is the figure that got kind of bandied around in juvenile court[.]"

leave and don't never come back." According to Donald, "[e]very time somebody would say something about something, they weren't allowed to come back over there, and that was the end of it." Shortly thereafter, Donald received a subpoena "for an ex parte" to keep him and his wife off the property.

On January 24, 2006, emergency medical personnel received a call reporting an unconscious, unresponsive, eighteen-year-old male and responded to the home of Defendant and Ronda. Emergency workers found Victim on the floor of his bedroom, which contained only a mattress, a five-gallon bucket filled with urine and feces, and a blue tarp covering the floor. Both the floor and the mattress were saturated with urine. The room was noticeably colder than the rest of the house, and the window had no glass in the lower pane, which was instead covered with wire. According to Defendant, the window had been broken "about two weeks" prior to Victim's death, and Defendant did not replace the window "because [Victim] would just break it again." There was an alarm on the bedroom door that would sound when Victim left the room.

Victim's body was cold to the touch and felt "like he had been put in a freezer." Victim was not breathing and had no pulse. Emergency medical personnel could not establish an airway and failed in an attempt to put in an oral pharyngeal airway because Victim's "neck was very rigid and [they] just could not get it to turn." Such rigidity is typical in either arthritic patients or those already in rigor mortis. Ultimately, emergency workers were unable to revive Victim. The coroner on the scene felt that Victim's death "wasn't recent." Victim had unusual bruising on his stomach and a bruise around his left eye, as well as numerous sores and scratches all over his body.

Socks had been duct-taped to Victim's hands, and the duct tape was wrapped so tightly that paramedics could not remove it without scissors. Victim was removed from the home on a backboard through the window.

Emergency personnel spoke with Defendant and Ronda about Victim's medications and saw numerous pill bottles with dates that were "significantly past[.]" Victim's pharmacy later confirmed that Victim's medications had not been dispensed "for quite some time." The day before Victim's death, he had a previously scheduled doctor's appointment, but Ronda called and cancelled it.

At the hospital, where emergency personnel apparently had taken Victim, Ronda told Officer George Young, an investigator with the Laclede County Sheriff's Office, that she had given Victim "liquefied oatmeal" between 8:30 a.m. and 9:00 a.m. that morning. At around noon, she heard a "thump" and, when she entered Victim's room, she found Victim face down on the floor. She yelled for Defendant, who came to check on Victim. Defendant then called 911. He also contacted his father-in-law, who in turn contacted Ada Shrout, Defendant's sister-in-law. When Ada, a certified nurse's aide who lived "across the field" from Defendant and Ronda, entered Victim's room, Ronda was the only other person present and no one was performing CPR on Victim. Ada began performing CPR on Victim; while she was working on Victim, green mucus began coming out of Victim's mouth.

After speaking with Defendant and Ronda at the hospital, Officer Young went to the Shrouts' home, where he was met by Defendant and Ronda. When Officer Young asked to see Victim's room, he discovered it was not as it had been described to him. Officer Young found that the broken window had been fixed, the tarp and

mattress removed because of the odor they were causing, and the five-gallon bucket emptied and cleaned. The floor appeared to have been washed. He also noticed that the closet door had screws going through the doorway into the door jamb that would prevent the door from opening.

Dr. Paul Spence conducted Victim's autopsy the day after his death.[5] Dr. Spence found all five lobes of both of Victim's lungs to be "purple and bloody" instead of a healthy pink. The lungs "were filled with a lot of fluid and very firm when [he] touched them[,]" and there were small nodules, or points of infection, consistent with pneumonia. The purple color also indicated pneumonia. There was red fluid in Victim's distal airways. Dr. Spence found Victim's cause of death to be bronchopneumonia. While the numerous ulcerations on Victim's body were not in themselves contributory to his death, they "could have led to the actual ... bacteria entering the bloodstream and traveling to the lungs, causing pneumonia." Pneumonia usually begins by infecting a single lobe of one lung and, "as it progresses, will eventually take over all lobes." Dr. Spence noted that, in this case, there was "a lot of cellular material inside the alveoli, so this was not a new infection, this was an infection that occurred over several days." With such an advanced infection, Victim would have had a fever and been frequently "cough[ing] up a lot of mucus, green-brown mucus, maybe bloody mucus" over the course of several days. Victim also had focal necrosis, or destruction of lung tissue, which is a final stage in the progression of pneumonia. Any additional

stress on Victim's body, e.g., extreme temperatures or malnourishment, would have hindered Victim's ability to fight infection.

Both Defendant and Ronda were charged with involuntary manslaughter in the first degree. Following a bench trial, the trial court found both Defendant and Ronda guilty of the lesser-included offense of second-degree involuntary manslaughter, pursuant to section 565.024. Defendant and Ronda were each sentenced to four years' incarceration; however, execution of both sentences was suspended, and both Defendant and Ronda were placed on probation for five years with 120–day shock incarceration in the Camden County Jail.[6] This appeal by Defendant followed.[7]

### Standard of Review

Our review of a court-tried criminal case is the same as that of a jury-tried one. *State v. McCarty,* 956 S.W.2d 365, 367–68 (Mo.App.1997). "We accept as true all evidence tending to prove guilt together with all reasonable inferences that support the finding, and all contrary evidence and inferences are ignored." *Id.* at 368. Moreover, we do not re-weigh the evidence or evaluate the credibility of witnesses, *State v. Frappier,* 941 S.W.2d 859, 861 (Mo.App.1997); rather, we defer to the factual findings of the trial court and review issues of law de novo. *State v. Sund,* 215 S.W.3d 719, 723 (Mo. banc 2007).

### Discussion

Defendant presents four points relied on for our review. We address them out of order.

5. Dr. Spence's written autopsy report (State's Exhibit No. 18) was admitted in evidence, but Defendant has chosen not to file or deposit it with this Court. *See* footnote 2.

6. Although the underlying facts took place in Laclede County, venue was transferred to Camden County.

7. Ronda's conviction in her separate appeal was affirmed by this Court in *State v. Shrout,* 415 S.W.3d 123 (Mo.App.2013).

## *"Void for Vagueness" Claim Not Preserved*

■ In his third point, Defendant claims that section 565.024.3 is void for vagueness "because the statute neither defines criminal negligence nor establishes a duty requirement and, therefore, . . . fails to provide guidance as to what conduct or actions it proscribes through explicit standards[.]" Consequently, Defendant contends that section 565.024.3 violates the Fifth and Fourteenth Amendments to the United States Constitution and article 1, section 10 of the Missouri Constitution. Defendant did not raise this issue at any time or in any manner in the trial court.

> Constitutional claims must be made at the first opportunity. Where the claim was not properly raised, however, this Court has discretion to review for plain error when the court finds that manifest injustice or miscarriage of justice has resulted. Under Missouri law, plain error can serve as the basis for granting a new trial on direct appeal only if the error was outcome determinative. Manifest injustice is determined by the facts and circumstances of the case, and the defendant bears the burden of establishing manifest injustice.

*State v. Baxter,* 204 S.W.3d 650, 652 (Mo. banc 2006) (internal citations and quotation marks omitted). Defendant, however, does not claim plain error and, therefore, fails in his burden of establishing manifest injustice. *See State v. Davis,* 348 S.W.3d 768, 770 n. 4 (Mo. banc 2011). His third point, having not been properly preserved for appellate review, is denied.[8]

## *Duty of Care Established by Law*

■ In his first point, Defendant claims that there was no duty of care established between Defendant and Victim because Victim was not in Defendant's custody pursuant to court order; rather, Victim was simply living in Defendant's home while Defendant's wife cared for him, and, without a duty of care, Defendant could not be found criminally negligent in Victim's death. Defendant's reasoning is incorrect.

■ All parties acknowledged to the trial court that, "[s]ince Missouri's manslaughter statute does not expressly provide for violation based solely on omission, a duty to act must be found elsewhere." *State v. Riggs,* 2 S.W.3d 867, 870 (Mo.App. 1999). Both the State and Defendant provided the trial court with argument and case law in support of their respective claims on this issue. The trial court "concluded that a duty of care arises, sufficient to support an involuntary manslaughter conviction, when one 'voluntarily assumes the care of a mentally handicapped individual, being fully aware of the individual's physical and mental condition and the care challenges created by those conditions.'" *State v. Shrout,* 415 S.W.3d 123, 125 (Mo. App.2013). The trial court went on to declare:

> I am firmly convinced from the evidence that the decedent was certainly dependent upon both of the Shrouts for his basic necessities, food, clothing, shelter, and medical care, and that the Defendants both having voluntarily sought out in juvenile court and having received and assumed the custody of the decedent in this case, that the Defendants

---

8. We note that, even if Defendant had properly raised and preserved this issue for our review, we question the merit of his claim because section 562.016, RSMo 2000, supplies the allegedly missing definition for "criminal negligence." "Statutes are treated in in pari materia and must be considered together when such statutes shed light on the statute being construed." *State ex rel. T.A.B. v. Corrigan,* 600 S.W.2d 87, 91 (Mo.App. 1980).

both owed a general duty of care to that young man and further a duty therefore to not act recklessly or with criminal negligence in carrying out that duty. *Id.* That Defendant was not legally designated as guardian for Victim via court order was irrelevant, as the pertinent duty of care arises when an individual "voluntarily assumes the care of a mentally handicapped individual[.]" *Id.* Defendant's first point is denied.

### Evidence Sufficient to Support Breach of Duty

█ In his second point, Defendant claims that the evidence before the trial court was insufficient to prove a breach of any applicable duty of care; rather, Defendant claims that the evidence "simply established that [Victim] was sharing [Defendant's] home without establishing any action or inaction on [Defendant's] part that would establish [Defendant's] criminal negligence and a breach of his duty of care." In reaching this conclusion, Defendant ignores our standard of review and fails to provide us with a complete record of the evidence before the trial court.

"We accept as true all evidence tending to prove guilt together with all reasonable inferences that support the finding, and all contrary evidence and inferences are ignored." *McCarty*, 956 S.W.2d at 368. In his argument on this point, Defendant primarily focuses on evidence and inferences contrary to the trial court's judgment. When the evidence is examined in accordance with our standard of review, it is sufficient to support the trial court's finding that Defendant is guilty of second-degree involuntary manslaughter.

The trial testimony showed that Defendant attended court hearings and meetings with the guardian ad litem regarding Victim, his special needs, and the request that Victim be allowed to live in Defendant's home; that Defendant was aware of Victim's behavioral and mood disorders prior to Victim arriving at Defendant's home; that Defendant was aware that Victim had problems maintaining a healthy weight; that Defendant was aware that Victim self-mutilated; that Defendant was aware that Victim frequently urinated and defecated on himself; that Defendant was aware that there were services available to assist them in caring for Victim, and Defendant had taken advantage of those services in the past, but had not utilized such services for a significant time immediately before Victim's death; that Victim's window was missing glass in the lower pane because, according to Defendant, if he replaced it Victim would break it again; that due to the broken window and winter season, Victim's room was noticeably colder than the rest of Defendant's home; that Victim's floor and mattress—his only furniture—were saturated with urine; that a five-gallon bucket filled with urine and feces stood in the corner of Victim's room; that Victim was saturated with urine; that Victim's body was cold and rigid; that Victim had not had his medication for at least a week before his death; that Victim was noticeably sick for at least a week before his death; that all five lobes of Victim's lungs were hardened and infected with pneumonia; and that Victim would have had a fever and been coughing up green, brown, or bloody mucus frequently for several days. While much of the evidence concerned Victim himself or the state of Victim's room in Defendant's home and not, at least directly, Defendant's behavior, it is reasonable to infer that Defendant would have noticed that someone living in the same trailer was constantly coughing up bloody mucus or that a room was filled with urine and feces, especially given that the mattress and tarp were almost immediately removed from the room after Vic-

tim's death because of the odor they were causing in the room.

The above evidence, coupled with the evidence that Defendant attended and participated in court hearings and meetings with Victim's guardian ad litem regarding Victim moving into Defendant's home, was sufficient evidence that Defendant knew of Victim's special needs, voluntarily assumed Victim's care in his home, and subsequently breached the ensuing duty of care in failing to provide an adequate environment and medical care for Victim.

■ Moreover, while the above evidence derived from the testimony in the trial transcript provides sufficient evidence to support Defendant's conviction, our review of Defendant's sufficiency of the evidence claim was significantly impacted by the lack of a complete record containing *all* of the evidence before the trial court in making its decision. Twenty-five exhibits were admitted into evidence at trial. Defendant chose not to file or deposit them with this Court as allowed by Rule 30.05 and Rule 4 of the Southern District Special Rules. When an exhibit is omitted from the record on appeal and is not deposited with the appellate court, "its intendment and content will be taken as favorable to the trial court's ruling and as unfavorable to the appellant." *State v. Hawkins*, 328 S.W.3d 799, 810 n. 3 (Mo.App.2010) (quoting *State v. Davis*, 242 S.W.3d 446, 449 n. 1 (Mo. App.2007)). While some witnesses testified concerning selected contents from some of these exhibits, the remaining information contained in these exhibits supporting the trial court's decision remains unknown to this Court. Given that we consider the omitted evidence as favorable to the trial court's finding of guilt, it logically follows that such an omission is fatal to an insufficiency-of-the-evidence claim. We need not decide that issue here, however, because as noted, the testimony in

the trial transcript provided a sufficient factual basis to support Defendant's conviction.

Defendant's second point is denied.

### Defendant's Guilt Based on His Personal Actions

■ In his final point, Defendant claims that he cannot be found guilty of second-degree involuntary manslaughter in the death of Victim because Ronda was also found guilty of second-degree involuntary manslaughter in Victim's death. According to Defendant, negligent homicide in Missouri requires that the death in question be the result of "the personal act of the party charged and not the act of another." *State v. Gartland*, 304 Mo. 87, 263 S.W. 165, 170 (Mo.1924). Defendant contends that because of this requirement, only one individual can be held responsible for a negligent homicide and, therefore, because his wife has already been convicted in Victim's death, to convict him also would impermissibly impute upon him his wife's actions. Defendant's argument is misplaced.

While Defendant's argument on this point rests on the theory of accomplice liability, Defendant cites no evidence from the record supporting that theory, and we find no such reasoning in the trial court's judgment. Rather, the trial court ascribed culpability to "both" Defendant and his wife no less than fourteen times in its judgment, noting that if *either* Defendant or Ronda had placed Victim in a warm, dry environment and provided him with medical care, Victim would likely still be alive. Instead of accomplice or vicarious liability, as Defendant argues, the trial court's expressed reasoning shows that it held Defendant responsible for his own personal actions, the lack of which resulted in Victim's death. Defendant's fourth point is denied.

### *Decision*

The trial court's judgment is affirmed.

DON E. BURRELL, JR., J. and MARY W. SHEFFIELD, J., concurs.