STATE OF IOWA, Appellee, v. GEORGE E. HUCKINS, Appellant.

No. 40469.

284

JANUARY 13, 1931.

REHEARING DENIED APRIL 11, 1931.

W. J. Barngrover and R. S. Milner, for appellant.

John Fletcher, Attorney-general, for appellee.

MORLING, J.—I. The information is in short form accusing the defendant George E. Huckins of obtaining on or about October 31, 1929, $300 in money from Emil Levsen by means of false pretenses. The information does not set out the false pretenses relied upon for conviction. No bill of particulars was demanded. The alleged false pretenses as shown by the evidence and submitted to the jury in the instructions were: That defendant ''and his father were engaged in the cigar business and were financing the overproduction of cigars that the large tobacco concerns had on hand; that they operated the business of dealing in seconds and taking care of the over-supply that the large tobacco concerns had on hand; that they sold directly to the retailers and dealers in large quantities and in car load lots; that it was all cash, that each lot had a bill of lading attached and at all times they either had the money in the bank or the merchandise on their hands so that there was absolutely no chance of loss. That they had no advertising,

no warehouses, and had no salesmen; that the profits were large and had turned over eight times a year. That he could make the interest twenty-six or fifty-two per cent, and that the volume of their business for the year 1928 was thirty million dollars, and that his father had in excess of two and a half million dollars worth of property in Wisconsin, all of which was clear.'' The court told the jury that in order to convict they must find that these pretenses, or some of them, were false. Defendant contends that there is no sufficient evidence of falsity to warrant the submission of the case to the jury.

The testimony is that the alleged false representations were made on or about the thirty-first day of October, 1929. In amplification and explanation of the representations above set out the prosecuting witness testified that defendant ''told me that the huge profits were due to the fact that they had no advertising, they had no warehouses and had no salesmen; that all this work was handled by three women that his father had in his office, and that the work could just as well be done by one of the girls instead of all three. * * * that the large tobacco concerns had to buy their tobacco supply three or four years in advance and often times they had an over-production of cigars on their hands which they called seconds and that he and his father financed these second cigars and resold them to dealers, retailers, and it was very similar to an automobile finance concern. * * *'' There is testimony that defendant was making similar representations to others and as early as March, 1926. There is testimony that defendant said that he got the idea of this business while he was working for the General Cigar Company from a letter addressed to Ogilvie which he opened. Ogilvie testified that he was for thirty years in charge of the General Cigar Company's distributing office at Des Moines for three-fourths of the State; that he had never heard of the wholesale cigar business of the defendant and his father only as he had read it in the newspaper, and knew of no such method by which seconds could be merchandised; that seconds are defective cigars; that ''they are just shipped to us and we just sell them to retailers throughout the country.'' Another witness who had been in the jobbing and retail tobacco business for thirty-nine years and had manufactured cigars for nineteen years testified that he never knew of cigar companies manufacturing

seconds or manufacturing quantities without having orders on hand. Never saw considerable quantities of cigars or seconds in any of the places that he had visited or known of manufacturers carrying surplus cigars.

Defendant had a secretary who testified that for about three years prior to the trial she took care of defendant's personal and private business, handled his correspondence, kept his books and had something to do with writing his checks and keeping his bank balances; that in June, 1929, she wrote some letters regarding the cigar business; but did not know to whom; that defendant told her it was not necessary to make copies; that she did not remember seeing in the correspondence between defendant and his father any reference to any wholesale cigar business in which either of them was engaged; that she remembered no check payable to any wholesale cigar company; never transacted for defendant any business for any wholesale cigar company relating to used (?) or second cigars; that the only book she ever kept for defendant was a small diary. For a number of years up to the time of the trial defendant was in partnership with witness Negus in running a cigar store in Cedar Rapids. Negus testified to similar representations made to him and to having invested with defendant and his father in consequence. He says: "I asked him if there was any chance of getting my money back and he said, no, not at this time. He told me he expected to serve time for this deal and when he got out he would have enough money to take care of me and pay me off." Mrs. Negus testified that December 8, 1929, defendant "said he would have to go to the pen and wear stripes * * * but when he got out he would have a sock full of money and he would take care of us." The witness Speas testified that before September 24, 1929, defendant "said they had this money and they would pay those squawkers in Wisconsin and glad they were getting out."

The witness Mrs. Royster, whose husband was one of the alleged victims, testified that defendant in a conversation relating to income tax "said you don't need to worry. It is all right and I said * * * Suppose the Government would go there and look at your father's books * * * and he said don't worry about being any books. We are too smart for that."

The foregoing is but a skeleton but it shows sufficiently the trend of the evidence.

Falsity may be proved by circumstantial evidence. People v. Harrington, 310 Ill. 613, 142 N. E. 246. The evidence warranted the jury in finding that the representations alleged to have been made to the prosecuting witness were false, except the representation that defendant's "father had in excess of two and a half million dollars worth of property in Wisconsin, all of which was clear." We find no sufficient competent evidence of the falsity of this representation to warrant the submission of the making and falsity of it to the jury.

II. Under our system of jurisprudence, and in harmony with our instinctive conceptions of justice and of just administration of criminal law, one accused of crime not only may not be convicted on mere accusation but accusation is not proof and ought not to be received as evidence of guilt. Indictment is found by the grand jury usually only on evidence offered by the prosecutor without hearing the accused and without opportunity to test by cross examination the validity of the accusing witness's assertions. An indictment is an accusation and only an accusation. It is not evidence. On cross examination the prosecuting witness Levsen admitted that an exhibit shown him was the minute of his testimony before the grand jury in another prosecution, that of the State against Elmer S. Huckins, Amelia Huckins and George E. Huckins accusing them of the crime of false pretenses in obtaining from Elwood Royster December 28, 1929, a check for $800. Defendant offered this minute of testimony in evidence. The offer was proper for impeaching purposes. The State thereupon offered the indictment to which the minute of testimony was attached and over defendant's objection it was received. It is argued in behalf of the State that the minute of testimony was a part of an entire document which consisted not only of the minute but also of the indictment. By statute (Code, 1927, Section 11272), "when part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; thus, when a letter is read, all other letters on the same subject between the same parties may be given." But this indictment was not a part of the minute of the testimony offered by de-

fendant nor a part of such testimony. The indictment was merely an accusation drawn by the grand jury therefrom and from other evidence formulated into an accusation. The use of the indictment as evidence of defendant's guilt was manifestly contrary to elementary principles governing the administration of justice.

■ III. It was the theory of the State that a conspiracy to defraud existed between the defendant and his father. There was sufficient evidence of the existence of such conspiracy to go to the jury. Therefore, acts and statements of the father, the co-conspirator, performed or made in the prosecution of the unlawful purpose otherwise relevant were admissible against the defendant on the principle that (assuming the jury should find the existence of the conspiracy) the father by such acts and statements was acting for both members of the conspiracy, or that what was done or said was a part of the res gestae of the conspiracy and of its object. Proof of conspiracy as laying the foundation for testimony to such acts and declarations of the father as acts and declarations authorized by defendant in engaging in the conspiracy was admissible. As defendant was not on trial for conspiracy and the existence of the conspiracy was merely evidentiary it was not necessary to allege in the indictment the conspiracy. State v. Browning, 153 Iowa 37; State v. Bittner, 209 Iowa 109; State v. Munchrath, 78 Iowa 268; State v. McAninch, 172 Iowa 96, 111; State v. Walker, 124 Iowa 414, 422; Mowry v. Reinking, 203 Iowa 628, 636; 16 C. J. 535, 659.

But one does not by merely entering into a conspiracy, or by its prosecution under his authority authorize his co-conspirator to make confessions or admissions for him or to narrate for him past events. Id. Such a confession or admission or narration not made in the hearing of the defendant, and not otherwise authorized by him is only an assertion or declaration made out of court by a third person—is merely hearsay, and on the commonest instincts of justice is not evidence to prove defendant's guilt of the crime with which he stands charged.

In disregard of these elementary principles the jury was allowed to take into consideration testimony as follows: The witness Lieser was permitted, over proper objection, to give testimony that in a conversation with the father November 8,

1929, at which defendant is not shown to have been present, "I asked him why he was down there trying to hook some of my friends, a man of his value, he told me that forty-two millions is in the bank at New York City. I said, why don't you go to New York and get that forty-two million dollars, why come around here and try to hook my friends for $1050 and $2100 apiece. He says, we can't do that, the Government is after us and we can't touch this money for fear they will tie it up for us." This witness testified that in November, 1929, in a talk with the father not shown to have been in the presence of defendant, the father said:

"He told me he could not imagine what was the matter with Earl (defendant), he thought everything was all fine, everything getting along fine, and everybody would get their dividends, in fact he read a letter to me that said a friend of his was going to give him $100,000 within 30 days. I think it was the first of January, he thought that would carry him over a little. * * He said that Earl was the head of the business and that he could not do anything until he saw Earl, so he instructed me to come down here and talk to his attorney. I was to call him up and ask him if I could not meet Earl somewhere, with him and Earl and I would have a talk with them, and I called Mr. Barngrover up when I got back." This witness further testified: "I asked him what had happened to all this money that he had and he said that he had lost it all and didn't have any, and I said, aren't you afraid of going to jail or something like this, and he says no, we have paid off all the squawkers, all we thought would squawk, and those we didn't think would squawk, we are not going to pay. * * * I told him at that time that George E. Huckins was turning his property over to his attorney at Cedar Rapids and he asked me why he should do that, that he had paid him $19,000. He said he paid his attorney at Cedar Rapids $19,300 since August, 1929. * * * And I asked him if he didn't think that was an awful amount of money to give an attorney in that length of time, and asked him what was done with the money. Well, he says that Attorney Barngrover was using the money to grease officials in Washington and Milwaukee."

The witness Royster testified that in a conversation with

the father at which defendant is not shown to have been present the father said:

"I have wanted to get you into this thing long ago, but Earl (the defendant) always kept you out because he said you talked too much, but Earl is willing to let you in, and he says, I want you to make the money back that I caused you to lose in this Wheel Company * * *."

All of this testimony was but narration for which defendant was not shown to be responsible, to have authorized or acquiesced in and statements made out of court which he had no opportunity. to test by cross examination. Accusation was made against him. By it defendant was accused of trying to "hook" some of Leiser's friends. He was accused by implication of being interested in an immense sum in a bank in New York inferentially a sum secured by fraud. Inferentially he was accused of defrauding the Government. It was thus asserted, without proof, that defendant "was the head of the business" out of which these offenses developed. He was charged with having turned over his property to his attorney. His attorney was charged with using money for purposes of corruption. His father was charged with having caused a loss in another concern inferentially by wrongdoing. The obvious purpose and the effect of this testimony was to charge defendant with misdeeds for which he was not on trial, to create indignation, wrath and prejudice against him and deprive him of the unbiased deliberation of the jury to which he was entitled.

IV. The State offered in evidence the testimony of various witnesses to representations made to them similar to those testified to by the prosecuting witness. Some of these representations were made before and some after those upon which the present information is based. Defendant contends that there was no sufficient evidence of their falsity without which they were inadmissible; that they constitute other and distinct crimes, some of them too remote.

The statute under which defendant is prosecuted reads:

"If any person designedly and by false pretense * * * and with intent to defraud, obtain from another any money * * * he shall be imprisoned * * *" Code, 1927, Section 13045.

Under this statute it is incumbent upon the State to show that the representations charged in the indictment or information were not only false but were made "designedly" and "with intent to defraud." The theory of the State is that the defendant and his father had been for a number of years engaged in a systematic scheme to swindle the public and that the pretenses for which the defendant was being tried were made in the execution of that scheme. On well settled principles the making of like representations or pretenses to others may be proved for the purpose of showing that those complained of in the information being tried were made intentionally and designedly, not innocently or accidentally. The perpetration of like frauds upon others at times not too remote in time and circumstance may be shown to establish the intent to defraud. State v. Mc-Williams, 201 Iowa 8; State v. Jamison, 74 Iowa 613; State v. Brady, 100 Iowa 191; State v. Carter, 112 Iowa 15; State v. Walker, 124 Iowa 414; State v. Detloff, 201 Iowa 159; State v. Baugh, 200 Iowa 1225.

It must, of course, be shown that the representations were false. State v. Yarham, 206 Iowa 833; State v. Foxton, 166 Iowa 181. As has been shown there was sufficient evidence to go to the jury on the question whether or not the representations were false. It was not necessary, however, to prove that pecuniary injury or actual loss resulted to the persons to whom such representations were made. The design and intent essential to be proved may be made to appear even though unsuccessful to the extent of causing actual loss. State v. LaVere, 194 Iowa 1373; State v. Jamison, 74 Iowa 613. Compare State v. Foxton, 166 Iowa 181, 194; State v. Chambers, 179 Iowa 436, 459. The design and intent to defraud may be proved circumstantially. Id. The evidence tends to show that the scheme to swindle had been formed a number of years before the making of the representations in controversy, had been prosecuted continuously and that those representations were made in the execution of that scheme. The alleged representations made to others were on the State's theory made in the prosecution of the same scheme. All of this testimony though covering a considerable period of time was not remote or disconnected but was immediate in plot and circumstance. State v. McWilliams, 201 Iowa 8, 9. Such evidence, however, may not be used as tending to prove that

the representations alleged in the indictment to have been made to the prosecuting witness were in fact made and the jury was so instructed. There was no error in the admission of this evidence.

V. By Instruction 6 the jury was told that "an unqualified statement that a fact exists made for the purpose of inducing another to act upon the fact, implies that the person who makes it knows it to exist, and that he speaks from his own knowledge, and if the fact does not exist and he states of his own knowledge that it does, and thereby induces another to act upon his statement to his injury, the law will impute to him a fraudulent purpose." One's intention or knowledge is a fact as to which he may make a false pretense and thereby (the other essential elements being present) perpetrate the crime of cheating by false pretenses. Commonwealth v. Morrison, 147 N. E. 588, 252 Mass. 116; State v. McMahon (R. I.), 140 Atl. 359. So one may by falsely representing that he has actual knowledge of the existence of an alleged fact when he does not have knowledge (the other elements being present) commit the crime. False representations may be made and communicated by acts as well as words. Commonwealth v. Morrison, 147 N. E. 588, 252 Mass. 116. One's representation that he has actual knowledge may be inferred from the circumstances as may the intent. Id.

But though the evidence may be circumstantial, by the very terms of the statute the accused must not only have had knowledge but must have acted "designedly * * * and with intent to defraud." State v. Hixon, 205 Iowa 1321. The specific intent to defraud is an essential element of the crime and it is not sufficient merely to prove general malice or general criminal intent. State v. Chambers, 179 Iowa 436, 446, 453, 454, 457; 16 C. J. 80; Rand v. Commonwealth (Ky. App.), 195 S. W. 802. Scienter and specific intent may be proved by circumstantial evidence. Id. The unqualified statement that a fact exists for the purpose of being acted upon may be accepted as evidence that the speaker intends to be understood as speaking not upon hearsay or as matter of opinion but from his own knowledge, and if made with the purpose that it be acted upon may be further accepted as evidence of intent to defraud. State v. LaVere, 194 Iowa 1373; Commonwealth v. Morrison, 147 N.

E. 588, 252 Mass. 116; Rand v. Commonwealth (Ky. App.), 195 S. W. 802. In civil cases the speaker may not, as against one who has in good faith acted upon the statement, afterwards assert that he did not know his statement to be false. Baker v. Bockelman, 208 Iowa 254; First National Bank v. Smith, 199 Iowa 1277.

But we are here dealing with a criminal accusation. It was not within the province of the court to determine the sufficiency of the evidence, or the weight or probative value to be given to any particular fact or circumstance, or to determine or instruct the jury that one fact having been found to exist that fact as matter of law implied the existence of another fact. It was not for the court to determine or to tell the jury that the law from the fact of the representation, express or implied, would impute to the defendant a fraudulent purpose. These were matters of fact exclusively within the province of the jury to pass upon. If the defendant honestly believed the representations to be true, or did not know them to be false, he may not be convicted. State v. Sherman, 183 Iowa 42, 60; State v. Rivers, 58 Iowa 102, 111. Compare People v. Harrington, 310 Ill. 613, 142 N. E. 246.

Whether or not the defendant did intend to be understood as speaking from his own knowledge and did possess the requisite fraudulent purpose was a question for the jury and ought not to have been taken from them as it in effect was by the instruction under consideration.

VI. Defendant complains that the witness Speas in testifying to a conversation with defendant in which representations similar to those charged in the present information were made to the witness was permitted to state that he told defendant "I can get money from my mother back home. She is a widow back in Toledo. She will have to mortgage her home to get it. He said, that is all right, have her sell her home and she will be sitting pretty." The witness was further permitted to testify that he got the money from his mother "in the manner he outlined." We are of the opinion that in order to prove knowledge, design and intent and the general plan to defraud defendant's statements to Speas in connection with the other circumstances shown in the case were admissible, but we are further of the opinion that the testimony that the wit-

ness got the money from his mother "in the manner he outlined" was not only a conclusion (a ground of objection not made) but was irrelevant. As has been shown proof that the person to whom the alleged false representations were made suffered actual loss or injury is not necessary. State v. La Vere, 194 Iowa 1373; State v. Jamison, 74 Iowa 613. The evidence in question was admissible only to show scienter and intention on the part of the defendant. His knowledge and his intent in making the statements are not proved by the influence which they had upon the other parties to similar transactions. The testimony to the effect that as a result of his statements a widow mortgaged her home has no bearing upon defendant's knowledge and intent. It could only arouse indignation and prejudice. Its admission was error.

VII. Complaint is made that defendant was tried in a hostile atmosphere, that the county attorney exceeded the bounds of legitimate debate in his closing argument and that the audience applauded. We need not consider these complaints further than to observe that the case is peculiarly one demanding restraint and moderation on the part of the prosecution and alertness of the court in preventing exhibitions of prejudice and in maintaining a judicial atmosphere.

We find nothing more in the thirty-nine other assigned errors calling for discussion.

Defendant must have a new trial.—Reversed.

FAVILLE, C. J., EVANS, STEVENS, ALBERT, KINDIG, and WAGNER, JJ., concur.

DE GRAFF, J., concurs in result.

GRIMM, J., not participating.