STATE v. JOSEPH NEAL and J. F. HINES, Appellants.—No. 38246.—
169 S. W. (2d) 686.

Division Two, March 25, 1943.

*Roy Coyne* and *Gene Frost* for appellant.

1004

*Roy McKittrick,* Attorney General, *Russell C. Stone* and *Gaylord Wilkins,* Assistant Attorneys General, for respondent.

1006

ELLISON, J.—The appellant was convicted in the circuit court of Jasper County of obtaining $1000 in money under false pretenses from one E. J. Mower, in violation of Sec. 4487, R. S. 1939, Mo. R. S. A., sec 4487. The prosecution was not based on Sec. 4694, R. S. 1939, Mo. R. S. A., sec. 4694, for obtaining money by cheats, frauds, bogus checks or other device commonly called "the confidence game." This was expressly admitted by the prosecuting attorney during the trial. The punishment assessed by the jury was imprisonment in the penitentiary for five years. The statute provides the punishment shall be the same as for stealing the money so obtained; and since the stealing of money of the value of $30 or more would be grand larceny, a felony, under Sec. 4456, R. S. 1939, Mo. R. S. A., sec. 4456, for which the maximum punishment is five years' imprisonment in the penitentiary under Sec. 4457, R. S. 1939, Mo. R. S. A., sec. 4457, the verdict is within the statute and we have appellate jurisdiction.

The assignments of error in appellant's brief are: (1) there was no substantial evidence to support the verdict because there was no showing that the representations made were false in a legal sense or that the prosecuting witness relied thereon; (2) the trial court overruled appellant's motion to quash the State's information notwithstanding the complaint filed in justice court, upon which the preliminary

hearing was based, plainly charged another offense different from that charged in the information; (3) the court heard and passed upon said motion to quash while appellant was absent from the court room; (4) admission of incompetent evidence; (5) failure to instruct on all the law of the case; (6) giving of erroneous instructions to the jury; (7) refusal to discharge the jury after improper argument by the prosecuting attorney; (8) and undue restriction of the cross-examination of State's witnesses by appellant's counsel.

 The first assignment, challenging the sufficiency of the evidence, is founded on the contentions: that many of the alleged representations made to the prosecuting witness, E. J. Mower, were not false, or at least were not proven to be so; that even if false they related only to future and not to existing or past facts, and therefore legally did not constitute false pretenses; and that in any event, Mower did not rely on them or make any effort to ascertain their truth or falsity.

The rule is well established in this State that: "The false pretense, to come within the statute, must be as to an existing or past fact, not a promise as to something to take place in the future. But a false pretense as to an existing or past fact may be sufficient to sustain a prosecution though there be coupled with it a promise to do something in the future. . . . The false pretenses need not be the sole, nor even the paramount cause of the delivery (of the money or goods). 'It is sufficient if they are a part of the moving cause, and without them the prosecutor would not have parted with his property.'" State v. Wren, 333 Mo. 575, 578(1), 62 S. W. (2d) 853, 854-5 (1, 2). As necessarily implied by the last sentence of the above quotation, the person from whom the money was obtained must have relied at least in part on the false representations. See also State v. Young, 266 Mo. 723, 732, 183 S. W. 305, 307; State v. Eudaly (Mo. Div. 2), 188 S. W. 110, 113 (8). But if reasonably calculated to deceive it is not necessary to show that the defrauded party investigated the representations to ascertain their truth or falsity, unless he had the means at hand. State v. Keyes, 196 Mo. 136, 151, 93 S. W. 801, 805, 6 L. R. A. (N. S.) 369. With these rules in mind we sketch the evidence relied on by the State to make a prima facie case of false pretenses.

The prosecuting witness, Mower, owned and he and his wife operated a twenty room hotel in Neosho, Missouri, called the Nemo Hotel. Early in February, 1941, two men came there, one giving his name as Winton and introducing the other as his nephew. They inquired if the hotel was for sale. Winton told witness Mower he desired to buy the hotel for the nephew at the price Mower named, $11,500 cash. After the lapse of two or three days Winton asked Mower to go with him to Joplin, a city of over 37,000 population

some 20 miles away, to consummate the deal. He gave as a reason that the nephew was detained by business at Joplin.

They arrived in Joplin at 9 o'clock A. M. and Winton parked his car on a cross street in the business section close to Main Street. He left, saying he would go to the First National Bank and get his nephew. In about five minutes he returned, reporting his nephew was not at the bank but had left a note (letter). After he had opened the car door to get in he picked up an envelope lying in the street and threw it on the car seat. Having entered the car he read the note from the nephew, which said the latter was engaged in a real estate transaction and would come within an hour; "if not the money will be at the bank." After Winton read the note witness Mower opened the envelope which Winton had picked up from the pavement. It contained a draft for $500 in New York exchange, a membership card on the Stock Exchange, a telegram in code and a bond for $250,000 or thereabouts.

Mower said he remarked someone had lost the envelope and would be looking for it. Winton proposed they could advertise in a news-paper, and Mower suggested calling the police department. They did neither but waited over an hour for Winton's nephew, in the meantime engaging in general conversation, sheep raising being one of the topics. Then appellant Neal came along apparently searching for something. He was a stranger to Mower and said his name was De Prince. He described the lost envelope and contents. Winton and Mower concluded he was the rightful owner and gave it to him. Neal was profusely grateful, got in the back seat of the automobile, and displayed a $50 bill, but neither Winton nor Mower would accept a reward. Neal then stated he was an expert on stocks, but was not supposed to play the market himself. At Neal's direction Winton took the $50 bill, purportedly went to the Stock Exchange and bought a certain stock. In about an hour Neal sent him ▆ back to collect, and Winton got $100. Then Neal told Winton to place the $100 on a designated stock along with $5000 for him (Neal); and for that purpose Neal produced a draft. Winton left the car and pres-ently returned with a receipt for his purchase. After the lapse of an hour or so Neal sent Winton back with directions to collect the money in cash. This time Winton returned, bringing with him one Hines (a codefendant who was or is to be tried separately).

Hines had some money in a paper package which he unwrapped. Witness Mower testified the following then occurred. Hines said: "Mr. Neal, this is your money; you have won it, but I cannot deliver it to you until you endorse this draft." Neal did endorse the draft; then Hines said, "I will ask you to endorse it for your own auditor also." Neal said, "I can't do that, this is a private transaction, and my auditor has nothing to do with it." But Hines would not turn it over to him. Neal said "Give me until closing time to raise

the money, and I will take it up." Hines said: "Well, I will keep the money until you raise five thousand dollars to show me that you would have that much money, so if you had sustained a loss you would have paid off." The evidence did not disclose how much money appellant Neal had "won" by the investment except that it was more than the $5000 he had put in. After Hines had gone Neal told Mower that Hines was "Mr. Devine, the secretary of the Exchange." All this conversation occurred in the automobile on the street.

At that point Mower suggested they give their attention to the business for which he had come to Joplin, the purchase of his hotel. Winton went to the bank and came back saying, "there is not enough money at the bank." Mower inquired how much he had and Winton answered, $8000. Mower than requested Winton to drive him back to his home at Neosho and that the deal be called off. Winton protested, saying he wanted to go right back to his home in Colorado where he was in the sheep business and had 16,000 sheep he was looking after; and he added, "I can raise the money here some way." Appellant Neal then volunteered, "Perhaps I can help you. . You gentlemen have treated me right. If you have a surety maybe I can raise a little money." Winton answered that he needed $3500. Neal said he thought he could raise $2500. He left the car either. to wire or telephone his mother in New York. While he was gone Winton said: "I will give you two (Mower and Neal) a joint mortgage on my sheep and I will take it up in 90 days. That way I can pay you the cash, $11,500, and you will be secured with the money and the mortgage and I can turn the hotel over to my nephew clear." The nephew never did show up.

Presently Neal reported back that his mother would wire him $2500. Winton then asked witness Mower if he could raise $1000. Mower said he could by going to his bank in Neosho. Winton and Mower then drove to Neosho and got the $1000, appellant Neal having promised to meet them at the same place when they returned. He did, and suggested they go to his room at the Keystone Hotel, which suggestion was followed. Winton pulled some money from his .pocket and threw it on the bed saying, "There is my $8000; where is yours?" Witness Mower produced his $1000 and gave it to appellant Neal who wrapped up the $9000, handed it to Winton, and said: "We will go over to the bank; my money will be at the bank." (Italics ours.) It was Mower's understanding they were going to place the money in the First National Bank until the necessary papers could be executed and delivered. It was the only bank that had been mentioned. Winton left the hotel room a little ahead of Mower and Neal and took the elevator first. When they got down to the lobby he had disappeared with the money. While Mower was looking for him Neal disappeared. The next time he saw them and Hines was when they were in jail at Berryville, Arkansas.

On re-direct examination Mower testified that while the parties were in the Keystone Hotel room Neal said his $2500 *then* was at the bank. This statement must have been made an hour or so after Neal had reported his mother in New York would wire the $2500, for he did that before Mower and Winton made the 40 miles round trip to Neosho to get Mower's $1000 from the bank there. It was also after Mower had turned the $1000 over to Neal, but in connection therewith and while the group were still in the hotel room. Further, the State proved by the head bookkeeper of the First National Bank of Joplin that the bank records did not show appellant Neal was a customer of that bank at the time or that he had any checking or ▉▉▉ savings account there. But prosecuting witness Mower admitted on cross-examination that he was not influenced by the confidence game out in the automobile, such as the finding of the envelope in the street, playing the stock market, and the statement that Hines was secretary of the Stock Exchange, etc. In fact he said the only representations he relied on were Winton's statement that he wanted to buy the Nemo Hotel for $11,500 cash, plus appellant Neal's statement that his $2500 was at the bank. This may be why the prosecuting attorney did not base the prosecution on the "confidence game" statute. State v. Block, 333 Mo. 127, 130-1, 62 S. W. (2d) 428, 430.

Mower was not asked and did not say whether he believed the money Winton threw on the bed at the Keystone Hotel in fact amounted to $8000. The State made no effort to disprove it, and doubtless could not. Neither was any effort made to show that Winton did not have 16,000 sheep in Colorado, or that he had a nephew, or that Hines was not Secretary of the Stock Exchange. Mower did not investigate any of these representations. Appellant Neal did not take the witness stand (except later at the hearing on his motion for new trial) and neither did the others implicated with him. The defense used only one witness, Gerald Stultz, Chief of Detectives at Joplin, by whom it was sought to impeach Mower by showing his complaint to the police was that he had been fleeced out of his $1000 on a deal to buy some bonds instead of in the sale of the Nemo Hotel; and also that he did not complain to the police until over two hours after the swindle, instead of ten minutes as Mower testified. Further, on cross-examination of Mower a communication written by him and published in a Neosho newspaper was introduced, which was thought by the defense to contradict the details of his testimony. We need not go into this evidence since it was, at most, only impeachment, and would still leave his story for the jury to pass upon.

After reading this part of the record several times we have reached the conclusion that Mower's testimony made a prima facie case of false pretenses under Sec. 4487, supra. It is true he said he was not influenced by the confidence game played out in the street; and it is

also true that part of the representations made were in the nature of promises, or things yet to be done. But as is said in the Wren case, supra, 333 Mo. l. c. 579, 62 S. W. (2d) l. c. 855 (2), quoting from 2 Bishop on Criminal Law (8 Ed.), sec. 424: "It would be difficult to find in actual life any case wherein a man parted with his property on a mere representation of fact, whether true or false, without an accompanying promise." According to Mower's testimony, Winton stated as a present fact that he wanted to buy the Nemo Hotel for his nephew for $15,000; that he then had $8000; and he produced what he said was that much money for that purpose. Neal stated as a present fact that he had $2500 at the bank to which they were supposedly going. In reliance on these representations Mower put in his $1000 and allowed Winton to abscond with it, thinking they were all going to the First National Bank of Joplin where the money would be left until the necessary papers were to be executed and delivered. In our opinion this evidence legally supports the verdict.

The next assignment, in logical order, complains of the trial court's failure to quash the information because it did not charge the same crime as that alleged in the complaint on which the preliminary hearing was based. Appellant asserts that in consequence he had no preliminary hearing on the crime for which he was tried, in violation of Sec. 3893, R. S. 1939, Mo. R. S. A., sec. 3893. There was this difference between the two. The complaint was against appellant Neal, J. F. Hines and *E. R. Kirksey* jointly. The justice of the peace bound over Neal and Hines, but discharged Kirksey. The information was filed against Neal and Hines, and ——— Winton was substituted therein for Kirksey.

The substance of the crime charged was the same in both the complaint and information, at least so far as Neal was concerned, namely: obtaining Mower's $1000 by false pretenses on the part of all the defendants as conspirators in the pretended purchase of the Nemo Hotel. The dates, amounts of money and activities of all the parties were the same in both, except that the complaint alleged *Hines* wanted to buy the hotel and had the $8000 whereas the information ascribed that role to *Winton*. Also the information pleaded the facts much more fully. The evidence shows appellant Neal was accorded a preliminary hearing; that the complaint alleged "a felony has been committed" in the language of Sec. 3857, R. S. 1939, Mo. R. S. A., sec. 3857; that the magistrate so found along with the fact that there was probable cause for believing appellant guilty thereof. All this being true the variance between the two documents was not fatal. State v. Flannery, 263 Mo. 579, 587-90, 173 S. W. 1053, 1055-6; State v. Gartland, 304 Mo. 87, 97, 263 S. W. 165, 168; State v. Woodard, 309 Mo. 19, 24-5, 273 S. W. 1047, 1048-9; State v. Bauer and DeBartalo, 321 Mo. 603, 609, 12 S. W. (2d) 57, 59; State v. Ancell, 333 Mo. 26, 32 (1), 62 S. W. (2d) 443, 446 (2-4).

Furthermore, the decisions just cited hold that where the defendant has waived a preliminary hearing, he cannot complain of defects in the complaint. In this case the record shows appellant Neal and defendant Hines (before the severance) both waived formal arraignment and entered pleas of not guilty in the circuit court. This waived the preliminary hearing and therefore the alleged defects in the complaint. State v. Langford, 293 Mo. 436, 443, 240 S. W. 167, 169.

The next assignment is that the circuit court heard and passed upon appellant's motion to quash the information while he was absent from the court room, in violation of Sec. 4054, R. S. 1939, Mo. R. S. A., sec. 4054 of our Criminal Code, which requires the defendant's presence "during the trial." The record proper shows that on April 13, 1942, the appellant Neal and the defendant Hines waived formal arraignment and pleaded not guilty; and thereafter on the same day appellant Neal filed his motion to quash the information. On April 17 the motion was taken up "by consent," and was overruled. There is no showing whether the appellant was present, and no objections or exceptions are recorded. The bill of exceptions is silent on all of the foregoing facts, except as the question was raised in his motion for new trial. During the hearing thereon appellant testified he was confined in jail when the motion to quash was presented and overruled. The trial judge stated for the record he knew the appellant was absent, but said he did not consider that fact fatal, and overruled the motion for new trial. All this transpired during the same term of court.

Sec. 1098, R. S. 1939, Mo. R. S. A., sec. 1098, in our Civil Code defines a trial as "the judicial examination of the issues between the parties, whether they be issues of law or fact." The issues raised by a motion to quash an information are issues of law. Appellant cites State v. Clifton, 57 Kan. 448, 46 Pac. 715, which upholds his contention under a similar statute; also some other foreign decisions and several early Missouri cases, which are not so much in point. It is true that our practice, and certain of our statutes pertaining to particular matters, treat the provisions of our civil law as extending to criminal cases, when applicable: Secs. 4068, 4069, 4084, R. S. 1939, Mo. R. S. A., secs. 4068, 4069, 4084; State v. Hardy, 339 Mo. 897, 900(2), 98 S. W. (2d) 593, 595. Does the foregoing definition of the word "trial" in our Civil Code apply to the same word in Sec. 4054, supra, in the Criminal Code. If the latter statute did unqualifiedly require appellant's presence during the circuit court's hearing on his motion to quash the information, his counsel could not consent to his absence; and their failure to object and except at the time to the overruling of his motion to quash cannot be charged against him as a waiver. Percer v. State, 118 Tenn., 765, 103 S. W. 780, 783. In other words, in those circumstances the point could be raised for the first time in his motion for new trial.

Sec. 4054, supra, is as follows: "No person indicted for a felony can be tried unless he be personally present during the trial; (then follow provisions dealing with prosecutions other than for felonies); and every person shall be admitted to make any lawful proof by competent witnesses or other testimony in his defense: *Provided,* that in all cases the verdict of the jury may be received by the court and entered upon the records thereof in the absence of the defendant, when such absence on his part is willful or voluntary, . . . ; *and provided further,* that when the record in the appellate court shows that the defendant was present at the commencement or any other stage of the trial, it shall be presumed, in the absence of all evidence in the record to the contrary, that he was present during the whole trial."

Several early cases treated the definition of the civil statute as applying to the criminal statute. Thus State v. Braunschweig, 36 Mo. 397, 399, said: "Trial is the examination of a cause, civil or criminal, before a judge who has jurisdiction of it, according to the laws of the land." And State v. Brown, 63 Mo. 439, 444, used the exact definition found in the civil statute. But State v. Montgomery, 63 Mo. 296, 299 declared: "The arraignment and the prisoner's ▮▮▮ plea must be the first step in the progress of the trial." And State v. Smith, 90 Mo. 37, 45, 1 S. W. 753, 755, quoted the following from Hopt v. Utah, 110 U. S. 574, 28 L. Ed. 262, 4 S. Ct. 202, "the trial commences at least from the time when the work of impaneling a jury begins." Further, this same Smith case said the criminal statute meant the defendant must be present at (italics ours) "every *material* step taken during the trial." Later, State v. Barrington, 198 Mo. 23, 90, 95 S. W. 235, 257, phrased it: "every *substantive* step taken . . . after the indictment is presented by the grand jury."

Now what is a material step or a substantial step in the trial? The early Brown case held the hearing on a motion for new trial "is not such a proceeding during the trial as is contemplated by the statute or embraced within its terms." This doctrine has been followed since; and the same has been held of an application for continuance, State v. Hall, 189 Mo. 262, 264-5, 87 S. W. 1181. Similarly it has been ruled that the trial judge's disqualification of himself and the calling in of another judge, the adjournment of court, the filing of an application for a change of venue and the overruling thereof, were not such steps as required the defendant's presence, State v. Long, 209 Mo. 366, 380, 108 S. W. 35, 39. A like rule was applied to an order for a special jury panel, made by the trial court during the defendant's absence. State v. Barrington, supra, 198 Mo. 1. c. 91, 95 S. W. 1. c. 257. But State v. Smith, supra, 90 Mo. 1. c. 44, 1 S. W. 1. c. 755, held examining and impaneling the jury is a material step.

Considering all these cases together it seems clear that the phrase "during the trial" in the criminal statute, Sec. 4054, supra, does not embrace the taking of every procedural and administrative step and the judicial examination of every issue of fact and law during the trial. Under the Smith case, supra, as cited in the second preceding paragraph, the impaneling of the jury ordinarily is the first step in the trial. The same is held in a number of other states,* the preliminary proceedings being excluded. Also in this State some of the proceedings after the return of the verdict are excluded (such as the hearing on the motion for new trial, under the Brown case, supra). Indeed, the first proviso of the statute added in 1879, permits the court even to receive the verdict—a very important step —during the defendant's voluntary absence. And during the trial, in the proper sense, the step must be *material* or *substantive,* to require the defendant's presence, under the Smith and Barrington cases, supra.

A sensible view of the question is taken by State v. Spotted Hawk, 22 Mont. 33, 45, 55 Pac. 1026, 1028, when it says the word trial, as thus used, "includes all those steps in the trial during which the defendant may be of assistance to his counsel in conducting the proceedings." This, of course, would not apply to the ruling on a motion to quash an information or indictment, since it raises purely legal questions. Furthermore, in the course of orderly procedure such a ruling would be made before the defendant enters his plea and before the jury is impaneled; and therefore would not be a part of the trial. For these reasons we think appellant's presence was not necessary under Sec. 4054, supra, when the court overruled his motion to quash the information; and that his assignment of error must be rejected—unless because of the question discussed in the next two paragraphs.

Does the fact that appellant was confined in jail and *could* not be present, make a difference? In State v. Hoffman, 78 Mo. 256, 259, it was held reversible error to overrule the defendant's motion for new trial in his absence, where his counsel had requested that he be brought in (presumably he was in jail). But the decision distinguished in one important particular the Brown case, supra, 63 Mo. 1. c. 445, (which had held the defendant's presence unnecessary when his motion for new trial was overruled). It said that in the Brown case the defendant based his right to be present on the *statute* under the "technical narrow" construction given it in that case, whereas in the Hoffman case the defendant demanded his right under Sec.

*42 Words & Phrases (Perm. Ed.), pp. 492-4; State v. Grisafulli, 135 Ohio St. 87, 19 N. E. (2d), 645, 647; Rosebud County v. Flinn, 109 Mont. 537, 540, 98 Pac. (2d), 330, 333; Hunnel v. State, 86 Ind. 431, 434; Commonwealth v. Soderquest, 183 Mass. 199; Byers v. State, 105 Ala. 31, 16 So. 716, 717; People v. Kidd, 347 Ill. 133, 136-7, 191 N. E. 244.

22, Art. II of the *Constitution,* which provides that in a criminal prosecution the accused *shall have the right* to appear and defend in person and by counsel (not that he *must* do so). On authority of this Hoffman case it has since been held the record must affirmatively show the defendant requested and was *denied* the privilege of being present. See State v. Lewis, 80 Mo. 110, 112; State v. Warner, 165 Mo. 399, 413, 65 S. W. 584, 587, 88 Am. St. Rep. 422; State v. Carroll, 333 Mo. 558, 563 (3), 62 S. W. (2d) 863, 866 (2); State v. Richetti, 342 Mo. 1015, 1025, 119 S. W. (2d) 330, 334 (2); State v. King, 342 Mo. 975, 980, 119 S. W. (2d) 277, 279.

Conceding the words "criminal prosecution" as used in the Constitution are broader and more inclusive than the word "trial" in the statute (Rosebud County v. Flinn, supra, 109 Mont. l. c. 540, 98 Pac. (2d) l. c. 333); and that they would include the hearing on a motion to quash an information; yet under the express holding of the Missouri cases just cited, the appellant undoubtedly could waive his constitutional right to be present. It is not contended there was any request, either by him or his counsel, that he be brought in. On the contrary, the record shows the motion was taken up "by consent." So we conclude this assignment of error is wholly without merit, and that the learned trial judge ruled correctly.

 Another assignment is that the trial court erred in failing to give an instruction to the jury on circumstantial evidence. There are two reasons why this assignment cannot be sustained. First, appellant made no request for such an instruction; second, the evidence was not wholly circumstantial. State v. Mansker, 339 Mo. 913, 922 (4), 98 S. W. (2d) 666, 672 (4, 5). Appellant Neal perpetrated some of the frauds before the prosecuting witness' eyes and in his hearing. He said his $2500 was in the bank, when it was not; he gave Mower's $1000 to Winton in the hotel room; and he absconded with the others after they had gone down to the lobby.

 The next assignment complains of the admission of the testimony of two State's witnesses concerning two similar confidence games perpetrated by appellant Neal and defendant Hines about six weeks prior to the instant offense. In one Neal proposed to buy witness Baldwin's residence property in Carterville, some of the "interested parties" being in Joplin. In the other, defendant Hines, giving his name as Walters, proposed to make a sale of witness Mrs. Viola Taylor's grocery store in Joplin to an "old man" in Pittsburg, Kansas. In both instances the vendors were severally taken to the place of the negotiations (Joplin in one case and Pittsburg in the other). While they were sitting in a parked automobile an envelope was picked up in the street (by Neal or Hines) and found to contain a telegram in code and a check. In one case Neal appeared, described and reclaimed the lost property; in the other Hines played that role. A reward was offered in each instance and refused. Then,

out of gratitude, the owner of the lost property, offered to give the finders a tip on a horse race, which pretended information had come in the coded telegram.

In this respect the facts differed from the instant case, for here Neal's gratitude took the form of helping finance the purchase of prosecuting witness Mower's hotel in Neosho. But neither witness Baldwin nor witness Taylor actually was solicited to or did put up any money on the horse racing scheme, though there was an implied invitation. Mrs. Taylor proved unresponsive and the schemers took French leave. Baldwin openly became so suspicious that he noted the license number of Neal's car, and the latter started to take it from his pocket. So, as the facts eventuated neither Baldwin nor Mrs. Taylor was duped by the scheme.

At the trial appellant did not dispute that there was factual similarity between the prior confidence game transactions in which Baldwin and Mrs. Taylor figured, and those in the instant case in which Mower was the intended victim. Indeed, when the testimony of Baldwin was first offered, appellant's counsel in making his objection said the State was proposing to show that appellant and defendant Hines (italics ours) "found a package and proceeded with the said Frank Baldwin *in the same manner* as the testimony shows was practiced on the prosecuting witness, E. J. Mower." But while having thus conceded below a factual similarity, appellant asserts here the three sets of facts were not similar. This point is not elaborated, and we do not know in what respect he thinks they were dissimilar unless it be the gratuity offered Baldwin and Mrs. Taylor was a tip on a horse race, and in the present case was an offer to help finance Winton's purchase of Mower's hotel. Appellant does add, however, that it was prejudicial for Baldwin to testify appellant tried to search him.

We attach no importance to these details. The rule in false pretenses cases, with respect to the similarity between prior transactions and those in the case on trial, where the evidence is introduced to show motive, intent, etc., is thus stated in 22 C. J. S., sec. 691, p. 1135: "The similarity generally required for admission is present where the evidential transactions are similar in general outline to that charged, even though they differ in detail." This doctrine is followed in Missouri. State v. Jackson, 112 Mo. 585, 590, 20 S. W. 674, 676. Likewise, the section of C. J. S. just cited, says with reference to frauds by confidence games: "Evidence of similar transactions in which accused took part . . . , and which are sufficiently connected in point of time or otherwise to authorize the inference that the transaction under consideration was in pursuance of the same general purpose, is admissible, as tending to prove guilty knowledge, intent, system or scheme, or conspiracy."

Only two questions raised by appellant call for discussion. The prior transactions between appellant and defendant Hines, on the one hand, and Baldwin and Mrs. Taylor on the other, were attempted confidence games, if anything, whereas the instant prosecution is not based on the confidence game statute, Sec. 4694, supra, but upon the more general false pretenses statute, Sec. 4487, supra. It has been held the two statutes declare different offenses: State v. Aikins (Mo. Div. 2), 180 S. W. 848, L. R. A. 1916C, 1101; State v. Wilson, 223 Mo. 156, 166, 122 S. W. 701, 704. The first question is: did the fact that there was *legal* dissimilarity between the Baldwin and Taylor transactions and those in this case (i. e., the prosecutions would have to be under different statutes) make the former inadmissible here? Again, neither Baldwin nor Mrs. Taylor was deceived by the prior attempted confidence games; and no money was obtained from either. Under such decisions as State v. Block, 333 Mo. 127, 131, 62 S. W. (2d) 428, 430, this would have precluded a successful prosecution for those offenses under Sec. 4694. The second question is: did that fact render the evidence inadmissible?

We have found no authority supporting appellant's contention on the first question. It is our opinion that evidence of prior confidence games practiced on third parties would not be rendered incompetent in a prosecution under the general statute for obtaining money under false pretenses, merely because the confidence games statute deals with a more particularized species of fraud. The essence of both is the same; and where there is substantial (though not technical) similarity in the facts, the evidence would support an inference of fraudulent motive or intent, common scheme, etc. It was so held on analogous facts in People v. Sander, 59 Cal. App. 82, 209 Pac. 1027, 1028(1). And a like ruling was made in People v. Revley, 67 Cal. App. 553, 227 Pac. 957, 961 (7), the court saying: "Even where no relationship exists as between two offenses, if the offered evidence be pertinent to the proof of the offense charged, it is admissible."

In support of his other contention, that proof of the attempted confidence games practiced on Baldwin and Mrs. Taylor was inadmissible because they were not deceived, and lost no money, appellant quotes two sentences from 16 C. J., sec. 1162, p. 598, which say the evidence of other offenses or representations "must tend to show the commission of an offense like in character to the one charged . . . ; and that such evidence is inadmissible where there is no proof that the prior representations "were false or that the person to whom they were made was defrauded." He further refers us to several cases cited by the above text, which we list in the margin.* Still others may

---

*Commonwealth v. Quinn, 222 Mass. 504, 111 N. E. 405, 408(12); State v. Foxton, 166 Iowa, 181, 147 N. W. 347, 52 L. R. A. (N. S.) 919, A. C. 1916E, 727; State v. Carter, 112 Iowa, 115, 83 N. W. 715; State v. Lewis, 96 Iowa, 286, 65 N. W. 295; People v. Robertson, 129 Mich. 627, 89 N. W. 340.

1018

be found in 80 L. R. A. 1314, note. On examination it will be found these decisions excluded the evidence of such former representations or offenses because there was *no proof* that they were false or fraudulent; and therefore they failed to show a fraudulent motive or intent. It is true, the Massachusetts case says there was no evidence that the third party there involved was *defrauded* by the prior representations; but it continues by explaining that so far as the evidence showed, the transaction may have been perfectly fair—thus disclosing the decision is in line with the other cases. On the specific question State v. Huckins, 212 Iowa, 283, 234 N. W. 554, 559(15), declared: "It was not necessary, however, to prove that pecuniary injury or actual loss resulted to the persons to whom such representations were made. The design and intent essential to be proved may be made to appear even though unsuccessful to the extent of causing actual loss." We hold the evidence here was competent, and overrule appellant's assignment of error.

 A further assignment complains that the trial court failed to instruct upon all of the law of the case in compliance with Sec. 4070(4), R. S. 1939, Mo. R. S. A., sec. 4070(4), in that it did not define the words "false pretenses." The only cases cited by appellant are State v. DeLay, 93 Mo. 98, 102, 5 S. W. 607, 609, and State v. Houchins (Mo. Div. 2), 46 S. W. (2d) 891, 894(3), which say the word "pretense," when used in a criminal statute, is to be understood in its legal and technical sense, as meaning a false representation of an existing or past fact. But State v. Keyes, 196 Mo. 136, 161, 93 S. W. 801, 809, 6 L. R. A. (N. S.) 369, held directly to the contrary, that the terms of the false pretenses statute, Sec. 4487, supra, "have no technical meaning different from that of their common daily acceptation;" and that they need not be defined in an instruction.

On the other hand State v. Mullins, 292 Mo. 44, 49, 237 S. W. 498, 503(2), sustains appellant's contention. It imposed the mandatory duty on the court to instruct that the jury cannot convict the defendant on a promissory representation. The case has not since been cited in this State. We are convinced that this Mullins decision is erroneous. As pointed out at the beginning of this opinion, it is incorrect to say unqualifiedly that the jury cannot convict a defendant on fraudulent promissory representations—when they are mingled with fraudulent representations of past or present facts. For the jury may consider and rely on the representations as a whole. The question is fully treated in State v. Wren, supra, 333 Mo. 1. c. 578(1), 62 S. W. (2d) 1. c. 854-5 (1, 2). In such circumstances we think the court is not bound to instruct that the jury cannot convict on promissory representations, or even on such representations *alone*. It would be necessary for the defendant to request an instruction drawing the proper distinction.

The tenth assignment charges prejudicial closing argument by the assistant prosecuting attorney, when he said "the old man (Mower) had been fleeced of his one thousand dollars, by these nefarious crooks." The bill of exceptions shows appellant's counsel requested that the jury be discharged and that the assistant prosecutor be reprimanded. Thereupon the latter said: "If I have done anything wrong I will withdraw that statement." The Court said: "The request will be refused on the part of the defendant; the remark, the Court believes, was brought about in answer to part of the argument of the attorneys for the defendant. Gentlemen, the jury will disregard the remarks of counsel; the remark itself, is improper, and you will not consider that in arriving at your verdict. All right, go ahead."

We see nothing in this incident calling for a reversal of the case. An examination of the six decisions cited by appellant shows that one does not support him; that two were prosecutions for sex crimes; that several other factors were involved and two judges dissented in another case; and that in the remaining two cases the remarks were more protracted and aggravated, and the action of the court less curative than here. The State's evidence, if believed, tended to show that appellant Neal and defendant Hines, at least, were systematic swindlers. Only the one statement was made by the assistant prosecutor, and he offered to withdraw that. The court's ruling indicated the remark was retaliatory and provoked by something said by opposing counsel which the record does not disclose. The court declared the remark improper and directed the jury to disregard it. This was sufficient, in our opinion.

The final assignment charges error in the court's refusal to permit appellant to recall prosecuting witness Mower for further cross-examination, after the State had rested and the defense had concluded its examination of its only witness, Gerald Stultz. Appellant had sought to impeach Mower, by proffered testimony from Stultz that Mower told Stultz the projected sale of the Nemo Hotel had been abandoned and the parties were discussing a "bond deal" when Mower lost his $1000. On an objection that no foundation had been laid, the court excluded the testimony. Perhaps for that reason appellant sought to recall Mower. But in doing so his counsel did not claim oversight, surprise or newly discovered information. They merely made the request and offer of proof for the purpose of impeachment. The previous cross-examination of Mower had been long, covering about 40 pages of the bill of exceptions. Defense counsel had then asked him if the swindle was not in fact connected with a bond sale, rather than the sale of the Nemo Hotel, which he denied. But they did not ask him whether he had made that statement to Stultz. When the request to recall Mower was denied, they conceded the matter rested in the discretion of the court—as is well

settled. 70 C. J., sec. 773, p. 601, sec. 786, p. 616, sec. 1030, p. 819; State v. Fredericks, 136 Mo. 51, 58(3), 37 S. W. 832, 833(3).

But here appellant cites State v. Hersh (Mo. Div. 2), 296 S. W. 433, 436(9), where a father was charged with raping his daughter. The cause was reversed and remanded on another ground, but since it would have to be retried the opinion merely stated error had been committed in refusing the defendant the right to recall the prosecuting witness for further cross-examination, even after the State had closed its case—this without assigning any reason for deviating from the genral rule, though it probably was because of the nature of the case and the fact that the prosecutrix was a 13 year old girl, and the daughter of the defendant. The opinion cites State v. Roe, 180 S. W. 881, 885(2), which holds that under Sec. 1891, R. S. 1939, Mo. R. S. A., sec. 1891, when one party calls a witness and elicits from him *any* testimony, the other party may cross-examine the witness on the whole case and ask leading questions (with certain exceptions). There can be no question about that. But neither the Hersh nor the Roe decisions can be regarded as holding the trial court has no discretionary control over the scope, time and subject matter of the cross-examination. No abuse of discretion was shown here, and the assignment is overruled.

Appellant's brief attacks two of the State's instructions, No's. 1 and 5, on grounds not presented in the motion for new trial. We cannot consider these. All the other assignments have been covered. Finding no error, the judgment is affirmed. All concur.