**STATE of Missouri, Respondent,**

**v.**

**James Clarence HAYNES, Appellant.**

**No. 56494.**

Supreme Court of Missouri,
Division No. 2.

July 17, 1972.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Robert H. Wendt, Robert A. Hampe, St. Louis, for appellant.

HENRY I. EAGER, Special Commissioner.

Defendant was convicted of first degree murder and the punishment imposed by the jury was life imprisonment. The appeal is here on a late notice permitted by order of this Court. Defendant was represented at the trial and here by appointed counsel. No question is made on the sufficiency of the evidence, so a brief review of the facts will be sufficient. There will be some reference to additional evidence, received and proffered, in our discussion of one point.

The following facts were shown by the State's evidence. On March 13, 1970, one Leroy Visor, the deceased, and Anthony Shinault drove in Visor's car to his apartment at 621 Laurel Avenue in St. Louis at about 7:15 or 7:30 p. m. and parked in front of the apartment. Leroy got out and went over to his mother's residence next door, also an apartment; she was standing in the door. He "approached" her, then rushed over to his own home; as he opened the door "these two suspects" (so designated by Shinault) were trying to run out, and Visor seemingly gave one of them a shove; very shortly a shot was heard and also screaming. At this point we pick up the testimony of Leroy's "common law wife," Laberta Hopson, who was inside. She heard three fast knocks on the front door, opened it a little, and two men forced their way in. One she positively identified as the defendant, and the other as a man whom she had known as "Johnny." She had known defendant about four months and he had been in her home perhaps 20 times. Defendant had a sawed-off shotgun, "threw" it in her face, shoved her back, hit her in the face with his hand, and made her lie down on the floor. He placed his foot in the middle of her back and jabbed at her head with the gun; he asked for money and was told that she did not have any. At that time "Johnny" went into the bedroom and brought out a portable television and then started taking some guitars out of the closet in the front room. At this stage of the proceedings Leroy Visor came to the front door and started in; defendant was there and Leroy grabbed him by the shoulders. Defendant "jerked back," put the gun to Leroy's head as he came in, and shot him; Leroy fell on the living room floor. Defendant then started "backing" out of the door. Neither defendant nor Leroy had said anything. Laberta heard two more shots in front of the home; she positively identified the defend-

ant in a lineup and at the trial as the one who shot Leroy.

Shinault, still sitting in the car, saw "one suspect" run out the door and down the street; then the other one came out, and ran or "backed" toward the car then "swerved" toward Leroy's mother's home; he heard a "click," laid down across the front seat, heard two shots, and stayed there until the police came. This witness did not, and indicated that he could not, identify either man and did not see their faces. He had known the defendant for about eight years, but made no pretense of identifying him.

Lucille Visor, Leroy's mother, called the police as her son left her house; she went to her front door and opened it slightly when she heard the shot in Leroy's home. She testified: that she saw James Haynes, pointing him out as the defendant, backing along the sidewalk in front of her door; that he faced her, had a gun, and shot twice, once up the street and again toward her son's car; the lighting was good, and she had known defendant for about three months, as he had been coming to her son's home; that she recognized defendant as soon as she opened the door. She identified him definitely at the trial.

The police came promptly, interrogated Laberta and took various photos of the scene. Leroy was pronounced dead upon arrival at the hospital. The photos were received in evidence. Defendant was not at his home when the officers went there, but he was arrested about 3:00 a. m. the next morning at a restaurant. His coat or jacket, his trousers, and his shirt were taken as evidence and offered at the trial. Laberta and the mother identified the coat as looking like the one defendant was wearing at the time of the shooting.

Defendant took the stand, denied all connection with the murder, and testified to facts which placed him elsewhere at the time in question. Several witnesses, members of defendant's family and friends, testified to facts placing him elsewhere before, after, or at the time of the killing. Some of these identified clothes as the ones defendant was wearing on that day or evening.

■ Defendant's first point is that he was deprived of due process and a fair and impartial jury because the Court excluded for cause four prospective jurors, upon their responses to inquiries regarding the death penalty. The point is denied for two reasons: (1) the death penalty was not imposed; and (2) the questions were not improper. Defendant relies on Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776; State v. Pinkston, 336 Mo. 614, 79 S.W.2d 1046, and State v. Thursby, Mo., 245 S.W.2d 859. Thursby is in nowise applicable. In Witherspoon the death penalty had been imposed and the Court held unconstitutional an Illinois statute which provided, in substance, that conscientious scruples against capital punishment or the fact that one "is opposed to same" should be cause for challenge. The Court stated that the case did *not* involve the exclusion of jurors who say that they "would refuse even to consider" the death penalty. In Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797, decided on the same day, the Court held expressly that the Witherspoon rule did not apply where defendant had received a life sentence and not death. The Court there also declined to hold that such a jury would be biased as to *guilt,* although inquiry had been made and certain members excused because they had conscientious scruples against imposing the death penalty or were opposed to capital punishment. In fact, the Court in Witherspoon reached that same conclusion, and reversed only as to the penalty.

Missouri has followed the Bumper ruling (or the principle announced) several times. State v. Richards, Mo., 467 S.W.2d 33; State v. Quinn, Mo., 461 S.W.2d 812; State v. Pollard, Mo., 447 S.W.2d 249; State v. Coyne, Mo., 452 S.W.2d 227. It is unnecessary to consider these cases individually, for the rule in Missouri is settled.

Defendant says that this jury was "stacked and conditioned" to a verdict of guilty. The cases hold to the contrary. Witherspoon, Bumper, Quinn.

■ We further hold that the questions asked of the veniremen were not improper under any of the cases. They were, generally: whether the prospective jurors had any conscientious scruples or religious beliefs which would prevent them from *considering* the death penalty. Those excused stated that they did have. Even the Witherspoon case did not disapprove that form of question and inferentially approved it. Our cases, just cited, have also voiced full approval of that form of question.

Defendant cites Section 546.130, RSMo 1969, V.A.M.S., which is as follows: "Persons whose opinions are such as to preclude them from finding any defendant guilty of an offense punishable with death, shall be ineligible to serve as jurors on the trial of an indictment or information charging any such offense, unless such disqualification is waived by the representative of the state when selecting the jury in any such case." Counsel say that the questions here did not follow the wording of that statute in that they did not ask for opinions regarding *guilt*. In State v. Pinkston, 336 Mo. 614, 79 S.W.2d 1046, cited by defendant, prospective jurors were asked whether under certain circumstances they would vote for the death penalty. The Court held that counsel should not have thus asked the veniremen to speculate upon what they would do. However, after *quoting the statute,* the Court held specifically at loc. cit. 1049 that "If a prospective juror's opinion were such that would preclude him from assessing the death penalty in a capital case, then he would be disqualified as a juror in that case," regardless of what his reason was. The Court then indicated that the proper form of question would be whether the juror had such an opinion "as would preclude him from returning a verdict with the death penalty * * *." The Court there approved, in substance, the very questions asked here and required nothing else under the statute. The statute does not require more, nor do our subsequent and very recent cases. The jurors here were not asked to commit themselves or speculate on either guilt or punishment. There was no error.

■ The second and remaining point involves an attempted impeachment of the witness Shinault, who was sitting in the car, saw the men come out, and laid down in the front seat. Shinault testified, initially: that it was dark, that he did not see either man's face, and particularly that he did not see the face of the second man identified otherwise as the defendant; that he would not have known him if the man passed him on the street; that he did not notice which of the two was "bigger" or their height; and that he could not identify their clothing. Although defendant's counsel cross-examined this witness at length he asked nothing concerning a supposed telephone conversation with defendant's brother on the early morning of March 14th. However, counsel later sought to impeach this witness by showing the alleged phone conversation. The Court, on objection, excluded this testimony of the brother on the ground that no foundation had been laid. Impeachment may only be made where the witness has been asked the specific question upon which he is sought to be discredited. State v. Dent, Mo., 473 S.W.2d 370. Still later counsel for defendant sought to recall Shinault to lay such a foundation. Whether defendant "reserved" the right to recall the witness, as he sought to do, cannot affect the discretion vested in the Court as we shall discuss it, and as the facts then appeared. After much colloquy and argument the Court agreed that Shinault might be recalled, but as defendant's witness. We note here that we fail to see why defendant urges that the Court erred in refusing to recall the witness and, contrariwise, the State argues that such refusal was not error. The record clearly shows that the witness *was* recalled and he was

examined, whether it be called cross-examination or not. He then testified: that he did call defendant's brother and told him of defendant's arrest; that he did not think he told the brother that the person who did the shooting "was not James"; that he did *not* tell him that the person "did not look like" defendant; that he did tell him that he "couldn't identify who it was." Some of this questioning was actually in the form of cross-examination, as "Did you * * * tell him * * *?" The ruling that Shinault be recalled only as defendant's witness really made no substantial difference.

■■ With this as a supposed foundation for impeachment, defendant produced the brother, Larnelle Haynes; he was examined out of the presence of the jury, actually as an offer of proof. This testimony was, in substance: that in the telephone conversation Shinault told him that the police had James and that "he couldn't believe it at first," and "that it couldn't be James you know"; that the man "wasn't as tall as James," and was stouter, but that Shinault changed his story at the Circuit Attorney's office. He further testified that he had told defendant's counsel of this conversation three or four months before trial and again during trial. Objection to this offer was originally sustained as hearsay and because no foundation for impeachment had been laid, but in the colloquy the Court added that Shinault had never identified the defendant, or said that the man was the defendant. As we read the record, the Court did not exclude the evidence because it was upon a collateral matter, as defendant now claims. But, be that as it may, if the ruling was correct, the reasons are immaterial. See State v. Hughes, discussed later. The substance of Shinault's testimony, throughout, was that he did not and could not identify the man and that, in the conversation, he did not exclude or include him. The testimony of the brother involved matters about which Shinault was not specifically asked. Thus, there was no substantive inconsistency, and no proper foundation for impeachment existed.

Such matters are universally held to be within the sound discretion of the trial court. State v. Neal, 350 Mo. 1002, 169 S.W.2d 686. Defendant insists that the discretion was abused here. We disagree. Counsel cite many cases on the general subject of the discretion, its abuse, and the right of review for abuse. They deal in generalities and it would be futile to review them here. They cite nothing which they claim to be on similar facts. The rule from defendant's own cited cases is that there is no error unless it is manifest that the Court's discretion has been abused and that the appellant has been injured. Counsel specifically refer to State v. Malone, Mo., 301 S.W.2d 750. There, with no further statement of facts, the Court merely held that it was not an abuse of discretion for the trial court, after first refusing defendant's request to recall certain State's witnesses, to authorize their recall and examination as adverse witnesses. The opinion has no real application here. A closer case upholding the Court's discretion here in refusing impeachment because no proper foundation had been laid is State v. Hughes, Mo., 460 S.W.2d 600; and there it was also held that if the Court was correct in excluding the evidence the action is not erroneous, whatever reason may have been given. The action of the Court in excluding the testimony of defendant's brother was well within its discretionary powers. We further note that defendant's counsel conceded that the supposed impeaching testimony would not have been admissible to prove the truth of the statements said to have been made by Shinault. In view of that proposition, and the fact that defendant was positively identified by two witnesses who *knew him,* we have the most serious doubt that the exclusion could have been prejudicial in any event. However, our ruling is based upon the Court's discretion. This point is denied.

Finding no error, the judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

MORGAN, P. J., HENLEY and DONNELLY, JJ., and SCHOENLAUB, Special Judge, concur.